**UNITED STATES of America, Plaintiff,**

v.

**James Allen Scott PITAWANAKWAT, Defendant.**

No. 00–M–489–ST.

United States District Court, D. Oregon.

Nov. 15, 2000.

Paul J. Papak, Federal Public Defender, Portland, OR, for Defendant.

924

## OPINION AND ORDER

STEWART, United States Magistrate Judge.

### *INTRODUCTION*

Canadian authorities seek extradition of defendant, a Canadian citizen, pursuant to 18 USC § 3184 and the governing Extradition Treaty between the United States and Canada, 27 UST 983, TIAS 8237, as amended by Protocol effective November 26, 1991 ("Extradition Treaty").

Defendant was arrested in Oregon on June 20, 2000, pursuant to a complaint and warrant of arrest seeking defendant's extradition to Canada. The Canadian government wants defendant extradited to serve the remaining 702 days of his three-year sentence of imprisonment imposed in 1997 for his convictions for one count of mischief causing actual danger to life and one count of possession of a weapon for a purpose dangerous to the public peace. Defendant's convictions stem from his participation in a 1995 incident referred to as the "Lake Gustafsen incident." Defendant and other native people,[1] known as the Ts'peten Defenders, occupied private property in British Columbia near Lake Gustafsen which encompasses a contested parcel of sacred ground. When the Ts'peten Defenders refused to leave, an armed standoff ensued with the Royal Canadian Mounted Police ("RCMP"). During the standoff, defendant discharged a rifle in the air at a police helicopter and rode in a vehicle which contained an AK–47 assault rifle. The Ts'peten Defenders eventually surrendered.

After being convicted, defendant served nearly one year in custody, was released on parole, and then violated the terms of his parole by leaving Canada without permission. As a result, Canada issued on arrest warrant for defendant for his parole violation.

Defendant opposes extradition to Canada based on Article IV(1)(iii) of the Extradition Treaty, commonly referred to as the "political offense" exception, which provides as follows:

(1) Extradition shall not be granted in any of the following circumstances:

\*   \*   \*   \*   \*   \*

(iii) When the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of the above-mentioned character. If any question arises as to whether a case comes within the provision of this subparagraph, the authorities of the Government on which the requisition is made shall decide.

On October 18, 2000, this court held an extradition hearing to determine whether defendant may be extradited under the Extradition Treaty.

### *FACTS*

In July 1989, Lyle James, a cattle rancher, conditionally allowed various native people, primarily Percy Rossette, to use some property owned by his corporation near the shore of Lake Gustafsen in British Columbia for the first annual Sundance Ceremony. Defendant's Exhibit C, p. 2. No permission was sought or received for subsequent Sundance Ceremonies held from 1990 to 1992. *Id.* The RCMP brokered a written agreement between the parties concerning the use of the land in 1993, but in 1994 the native people used the land again for a Sundance Ceremony without permission. *Id* at 3.

In January 1995, Bruce Clark ("Clark"), a lawyer (now disbarred) representing the Native Sovereignty Association of which Rosette was a member, petitioned the Queen of England to restore the jurisdic-

---

1. This court is uncertain as to the appropriate terminology to describe the indigenous people of Canada. For ease of reference, this court will simply refer to them as native people.

tion of the native people over their hunting grounds which had been illegally usurped by the Canadian courts and by "band" governments elected under the Indian Act operating on illegal "reserves" on unsurrendered hunting grounds. *Id* at 3; Government's Exhibit A. Clark's thesis is premised on Canada's violation of the international genocide conventions by failing to conform with its existing law of aboriginal rights. Defendant's Exhibit K–12.

According to Clerk's petition, Queen Anne's Order dated July 9, 1704, established an independent and impartial Standing Committee with jurisdiction over boundary disputes between the native people's hunting grounds and the Crown's public lands. In addition, the Royal Proclamation of 1763 by King George III, the founding document of British Imperial Canada, granted jurisdiction to the colonial Crown Courts over persons committing crimes upon public lands who flee to hunting grounds to evade criminal process. In the Constitution Act of 1982, the Canadian Parliament confirmed "existing aboriginal and treaty rights" and therefore the 1704 and 1763 Orders. However, various acts in the 1800s illegally usurped jurisdiction over unsurrendered hunting grounds. The petition sought to have a Standing Committee, previously constituted by the 1704 Order, address and report on the boundaries of existing native people's hunting grounds and the legal sanctions applicable against various respondents "for (misprision of) treason and fraud and complicity in crimes related to genocide due to usurpation of jurisdiction in relation to the Hunting Grounds so delimited." The respondents included the Chief Justices of Canada and three provinces, as well as the Grand Chief of the Assembly of First Nations.

Shortly afterwards, defendant, Rosette, and other native people established a permanent encampment on James' land and began constructing a fence around it. Defendant's Exhibit C, p. 3. On June 13, 1995, James served a notice of trespass on the individuals in the encampment. *Id.* The native people in the encampment refused to vacate the land even after further negotiations brokered by the RCMP.

This dispute over James' property stems from the contention of the Ts'peten Defenders that the tribes in British Columbia never ceded or sold their lands to the Canadian government and have a right to occupy their land, rather than settle land claims through peaceful negotiations with the governments of British Columbia and Canada. Defendant's Exhibit E, p. 2.

On June 20, 1995, the Cariboo Tribal Council and the Canoe Creek Indian Band issued separate statements that they "neither condone nor support the actions of this small group." Government's Exhibits B & C. The Cariboo Tribal Council represents the five local aboriginal tribes, including the Canoe Creek Band whose traditional hunting grounds include James' land.

The Sundance Ceremony was held in July 1995. Defendant's Exhibit C, p. 3. Afterward, the individuals in the encampment refused to vacate James' property and the RCMP began an investigation based on information that illegal firearms and explosives were being moved into the camp. *Id.* Members of the encampment were seen in camouflage gear carrying rifles, and a spokesman stated that any entry by police would be seen as an "act of war." *Id* at 4. At that time, the encampment may have contained 30–40 people, including women and children.

On July 20, 1995, the Canoe Creek Band declared that they preferred to "use the Treaty Process" and again disassociated themselves from the individuals in the encampment. Government's Exhibit D. However, at some point, a delegation of Shuswap Indians delivered stocks of food and tobacco to the encampment. Defendant's Exhibit F. Many other groups also expressed support for the Ts'peten Defenders, including the Union of B.C. Indian Chiefs and the people of Kahnawake Mo-

hawk Territory in Quebec. Defendant's Exhibits K–9 & J–2.

Native constables continued negotiations with members of the encampment. Defendant's Exhibit C, p. 4. However, by late August 1995 the RCMP became alarmed at an increasing number of incidents involving the possession and use of weapons near Lake Gustafsen and by reports that members of the encampment viewed any entry of the police as an act of war. *Id* at 4. Between August 24 and 26, 1995, the Ts'peten Defenders' spokesperson, Jones Ignace ("Ignace"), instructed members of the camp that should police enter: "It's clearly war. We're all going to do federal time, 20 years. We're not going to go peaceful. Body bags or do a hell of a long stretch ... Nobody is going to tell you to put your weapons down." *Id* at 5. Ignace told negotiators that unless their demands were met, the only way they were coming out was in body bags. *Id.*

The situation escalated as the RCMP increased their presence by constructing a base camp (named "Camp Zulu") replete with armored personnel carriers, helicopters, a field hospital, a communications center, a landing field, military assault weapons, and a heavily armed militarized police force of 400 officers in camouflage gear. The Canadian army also was involved under the secret code name "Operation Wallaby." Defendant's Exhibits A & H, pp. 7–8.

On August 24, 1995, defendant, among others, fired on a police helicopter flying near the camp. Though within range, the helicopter was not struck. Defendant's Exhibit C, p. 6.

On August 25, 1995, the occupants of the camp demanded the January petition be addressed. *Id.* On August 26, 1995, Clark reported to the Queen of England that the Governor General had refused to stop the "genocide against the traditionalist sector of the aboriginal peoples" and asked her to save Canada "from its errant political and juridical [sic] leadership" by acting on his clients' petition. Government's Exhibit A,

p. 1. Clark entered the camp on August 31, 1995, which strengthened the resolve of the encampment to continue the armed stand-off. Defendant's Exhibit C, p. 7.

August 27, 1995, saw a marked increase in the degree of violence being employed by some members of the encampment. *Id* at 6. On that day, individuals from the encampment discharged firearms at police and highway workers who were removing trees felled across a road by members of the encampment. *Id.* Other exchanges of gunfire occurred on September 7 and 11, 1995. *Id* at 7–8.

On September 11, 1995, the RCMP and members of the encampment exchanged gunfire and defendant and another individual drove across the police perimeter in a truck. *Id* at 8. The truck was blown up as it crossed a concealed explosive device (referred to by defendant as a land mine) on a road. *Id.* Defendant and his companion escaped injury and arrest, but left behind a rifle and AK–47 in the truck. *Id.* In that episode, 10,000 to 20,000 government rounds were fired. Defendant's Exhibit K–1.

The stand-off ended after almost two months when the 18 individuals (13 men and five women) remaining in the encampment surrendered between September 11 and 17, 1995, and were charged with various crimes. Defendant's Exhibit C, p. 10. A search of the camp by police revealed a large cache of firearms, ammunition, and a pipe bomb. *Id.* The surrounding trees were "riddled with 77,000 rounds of bullet holes" fired by the RCMP toward the camp. Defendant's Exhibit L–15.

Lake Gustafsen was only one of many incidents involving native people during the summer of 1995. That same summer saw other protests, road barricades, and occupations of parks and private property across Canada. Defendant's Exhibits K–7 & K–8. In July 1995, about 100 rebel Chippewas occupied a military camp in Ontario and the neighboring reserve. Defendant's Exhibit F. In September 1995 about 40

rebel members of the Kettle and Stony Point tribes occupied the neighboring Ipperwash Provincial Park in Ontario, asserting that it was the site of a sacred burial ground. *Id.* The Ipperwash incident involved a gun battle which became deadly when police shot and killed one protestor and injured two others. *Id.* Also in September 1995, about 40 Nuxalk Nation chiefs, elders, and supporters peacefully blockaded access to their unceded tribal lands at Fog Creek near Bella Coola, British Columbia. Defendant's Exhibits J–11 & J–12.

After a 10–month trial, a jury convicted defendant and 17 others of various crimes. Defendant was convicted of mischief causing actual danger to life and possession of a weapon for a purpose dangerous to the public peace. The maximum sentence is life imprisonment for the former offense and 10 years imprisonment for the latter offense. On July 30, 1997, the judge sentenced defendant to three years imprisonment for mischief and to one year concurrent imprisonment for possession of a dangerous weapon. The judge also imposed a lifetime ban on defendant's possession of firearms, ammunition and explosive substances. In the course of the Judgment imposing the sentences, the court explained that:

> Briefly stated, this country has a long history of civil protest in support of causes believed to be just. Where the form of protest crosses the line into criminal activity, there are criminal consequences to be borne. This is so regardless of the perceived justice of the causes.
>
> This country is grappling with native land claims. The band led by Chief Agnes Snow, for example, is advancing such a claim over the land in question. These claims are being advanced diligently in a responsible and lawful manner, despite the obvious frustrations.

There is no question that all accused genuinely believe in the justice of their cause, though some no longer advocate the unlawful use of weapons to further that cause. All felt great frustration at the failure to achieve any success for their cause in the courts or through other lawful channels. Nor did they enjoy the support of local elected bands who, along with the Assembly of First Nations, are dismissed by them as government collaborators.

> What separates the Gustafsen Lake stand-off from other forms of civil protest and even unlawful civil disobedience was the use of weapons, violence and threats of violence to prevent their removal from the land should their demands not be met.
>
> If police had been prepared to risk almost certain loss of life with an armed entry to effect arrests, the incident would have ended quickly. They wisely chose a course calculated to minimize that risk. This required patience and the costly deployment of hundreds of officers working in shifts to contain this remote and isolated area. It also required the use of armoured personnel carriers designed to deploy and retrieve officers in safety. It required the use of negotiations and intermediaries. Mistakes were certainly made and events took unexpected turns, but ultimately the plan proved successful, though the cost to the public was high.

Defendant's Exhibit C, pp. 24–25.

After serving one year of his sentence, defendant was released on August 18, 1998, on "day parole" for his good conduct in prison. His parole was due to expire February 17, 1999. However, he absconded just nine days after being released by moving to the United States without permission. Although defendant does not possess United States' citizenship, his native heritage entitles him to legally reside in the United States as a resident alien.[2]

---

**2.** The parties have not addressed whether or not defendant is deportable based upon his Canadian conviction.

**928**

Canada issued a warrant on August 27, 1998, for defendant's arrest for violating the terms of his parole.

After more than 20 years of negotiating, the Nisga'a Indian Nation agreed in 1998 to a land rights treaty, which was the first such treaty between Canada and an aboriginal tribe in British Columbia in the last 100 years. Defendant's Exhibit G. Canada and British Columbia are continuing to negotiate land claims with more than 40 Indian councils and nations. *Id.*

### STANDARDS

■ In order to find that defendant is subject to surrender to Canada under the terms of the Extradition Treaty, as well as under the relevant statutes and case law, this court must find that:

(1) It has jurisdiction to conduct the extradition hearing and has proper jurisdiction over the defendant;

(2) The defendant is being sought for an offense for which the Extradition Treaty permits extradition; and

(3) There is sufficient evidence to establish that the defendant appearing in court is the same person sought by Canada and that he committed the offense charged. *See e.g., Clarey v. Gregg*, 138 F.3d 764 (9th Cir), *cert denied,* 525 U.S. 853, 119 S.Ct. 131, 142 L.Ed.2d 106 (1998); *Then v. Melendez*, 92 F.3d 851, 855 (9th Cir1996).

Defendant admits both that this court has the requisite jurisdiction to conduct the extradition hearing and that he is the same person sought by Canada and that he committed the offense charged. However, he challenges the second condition necessary for extradition. Based on the political offense exception in Article IV(1)(iii) of the Extradition Treaty, he

claims that he cannot be extradited to Canada. Specifically he contends that the political offense exception applies because he was part of an uprising by native people with both religious and political overtones.

■ This court has jurisdiction to determine whether the political offense exception should apply in a particular case to bar extradition. *Quinn v. Robinson*, 783 F.2d 776, 786 (9th Cir), *cert denied* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).[3]

### DISCUSSION

#### I. Burden of Proof

■ The initial burden of proof is on defendant to establish the essential elements of the political offense exception. Once established, the burden shifts to the demanding government "to prove that the crime charged in the Complaint was not of a political character." *Ramos v. Diaz*, 179 F.Supp. 459, 463 (S.D.Fla.1959) (denying extradition to Cuba of an escaped prisoner convicted of murder committed during the Cuban revolution). Defendant argues that the weight of the evidence supports his position and that the government has not sustained its burden.

#### II. "Incidence Test"

Because the treaties contain no definition of a political offense, the interpretation of the political offense exception has been relegated to the courts. In *Quinn,* the Ninth Circuit thoroughly discussed the historical development and present state of the political offense exception. This exception, which arose in the aftermath of the American and French Revolutions, was first incorporated into

---

**3.** If a court certifies to the Secretary of State that an individual is extraditable and any *habeas corpus* review·has concluded, the Secretary in her discretion may determine whether or not the person should be surrendered to the custody of the requesting state based on humanitarian or other concerns. 18 USC § 3185; *United States v. Kin–Hong*, 110 F.3d

103, 109–10 (1st Cir.1997). It is not the role of the courts, but rather the Secretary of State, to determine whether extradition should be denied on humanitarian grounds. *Cornejo–Barreto v. Seifert*, 218 F.3d 1004, 1011 (9th Cir.2000), citing *Lopez–Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir.1997).

treaties in the early nineteenth century and is "now almost universally accepted in extradition law."* *Quinn,* 783 F.2d at 792. It was consciously designed to protect the right of citizens to rebel against unjust or oppressive government and is premised on the following justifications:

> First, its historical development suggests that it is grounded in a belief that individuals have a "right to resort to political activism to foster political change." This justification is consistent with the modern consensus that political crimes have greater legitimacy than common crimes. Second, the exception reflects a concern that individuals—particularly unsuccessful rebels—should not be returned to countries where they may be subjected to unfair trials and punishments because of their political opinions. Third, the exception comports with the notion that governments—and certainly their nonpolitical branches—should not intervene in the internal political struggles of other nations.

*Id* at 793 (citations omitted).

█ Political offenses traditionally fall into one of two categories: "pure political offenses" or "relative political offenses." *Id* at 793. "Pure political offenses are acts aimed directly at the government, and have none of the elements of ordinary crimes. These offenses, which include treason, sedition, and espionage do not violate the private rights of individuals." *Id.*

█ In contrast, the category of relative political offenses includes "otherwise common crimes committed in connection with a political act," or "common crimes .... committed for political motives or in a political context." *Id* at 794. After comparing the legal standard from other countries for determining if relative political offenses are extraditable, *Quinn* traced the development of American law from the British "incidence test" of *In re Castioni* [1891] 1 Q B 149, 166 (1890). In *Castioni,* the Swiss government requested that Great Britain extradite a Swiss citizen who, with a group of other angry citizens, seized the town arsenal, armed themselves, stormed the palace gates, and forcibly possessed the palace, killing a government official in the process. At the time of the incident, popular displeasure with the regime was running high and the government had refused a citizen's petition to hold a referendum on the question of the revision of the constitution. The British court denied extradition, finding that Castioni's actions were "incidental to and formed a part of political disturbances" and holding that common crimes committed "in the course" and "in the furtherance" of a political disturbance would be treated as political offenses. *Quinn,* 783 F.2d at 795, quoting *Castioni,* 1 Q B at 156, 166.

American law has adopted a version of the "incidence test." In the seminal United States case, *In re Ezeta,* 62 F. 972 (N.D.Cal.1894), the court denied extradition to El Salvador of a number of individuals accused of murder and robbery committed while unsuccessfully attempting to thwart a revolution. The court held that the alleged acts were "committed during the progress of actual hostilities between the contending forces" and were "closely identified" with the uprising in "an unsuccessful effort to suppress it." *Id.*

The only United States Supreme Court case addressing the political offense exception is *Ornelas v. Ruiz,* 161 U.S. 502, 509–12, 16 S.Ct. 689, 40 L.Ed. 787 (1896), which allowed the extradition of certain Mexican bandits who raided a Mexican border town at or about the time of revolutionary activity because they were not engaged in any combat with Mexican governmental forces when they committed the charged offenses. In order to determine if the actions were part of "a movement in aid of a political revolt, an insurrection, or a civil war," the Supreme Court listed several factors pertinent to the political offense inquiry, including "the character of the foray, the mode of attack, the persons

killed or captured, and the kind of property taken or destroyed." *Id* at 511, 16 S.Ct. 689.

■ As summarized by *Quinn*, the "incidence test" applied by lower courts since *Ornelas* has a "two-fold requirement: (1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense, and (2) a charged offense that is 'incidental to,' 'in the course of,' or 'in furtherance of' the uprising." *Quinn*, 783 F.2d at 797 (citations omitted).

The Ninth Circuit acknowledged that the "incidence test" has been criticized as underinclusive because it exempts "all offenses that are not contemporaneous with an uprising even thought the acts may represent legitimate political resistance." *Id* at 797–98. This test also has been criticized as overly broad by making non-extraditable "some offenses that are not of a political character merely because the crimes took place contemporaneously with an uprising." *Id* at 798. Despite this criticism, *Quinn* concluded that, properly applied, "the American test in its present form remains not only workable, but desirable." *Id* at 801.

Noting the "recent lack of consensus among United States courts confronted with requests for the extradition of those accused of violent political acts committed outside the context of an organized military conflict," *id* at 803, the Ninth Circuit rejected new restrictions imposed by the Seventh Circuit in *Eain v. Wilkes*, 641 F.2d 504 (7th Cir. 1981), *cert denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (affirming the extradition to Israel of a PLO member accused of exploding a bomb in Israel that killed and injured civilians). Those restrictions redefined an "uprising" as a struggle between organized, non-dispersed military forces, considered

the legitimacy of the political objectives, and excluded violent acts against civilians.[4] Instead, according to the Ninth Circuit, the "incidence test" is "ideologically neutral" and applies regardless of the tactics used. *Id* at 804. "It is the fact that the insurgents are seeking to change their governments that makes the political offense exception applicable, not their reasons for wishing to do so or the nature of the acts by which they hope to accomplish that task." *Id* at 804–05.

Nevertheless, while protecting "acts of domestic violence in connection with a struggle for political self-determination," this test "was not intended to and does not protect acts of international terrorism." *Id* at 806. Crimes against humanity also are beyond the scope of the political offense exception. *Id* at 801. In addition, the applicability of the "incidence test" to government officials and international conflicts is questionable. *Id* at 808, n. 33.

Based on this interpretation of the "incidence test," the Ninth Circuit refused to extradite Quinn, an Irish–American, to Great Britain for conspiring with the Provisional Irish Republican Army ("PIRA") to cause letter bomb explosions in London and the murder of a British police constable seeking to apprehend him for that offense. It found that criminal activity by the PIRA in Northern Ireland, "with the objective of separating Northern Ireland from the United Kingdom and reuniting the northern and southern parts of Ireland," "clearly would fall within the political offense exception," but not PIRA criminal activity "exported to other locations." *Id* at 812, 814–15. Not only was the level of violence outside Northern Ireland "insufficient in itself to constitute an 'uprising,'"[5] but also an uprising "refers to a people *rising up*, in their own land, against

---

4. To the extent that it adopted some of the *Eain* analysis, *Quinn* also rejected the approach of *In re Doherty*, 599 F.Supp. 270 (S.D.N.Y.1984), which denied extradition to the United Kingdom of a member of the Provisional Irish Republican Army accused of

attacking a convoy of British soldiers in Northern Ireland,

5. Judge Fletcher, although concurring in the result to remand, dissented with this portion of the majority opinion. *Id* at 820.

the government of that land." *Id* at 814. The Ninth Circuit was unwilling "to stretch the term 'uprising' to include acts that took place in England as part of a struggle by nationals of Northern Ireland to change the form of government in their own land." *Id* at 814.[6]

### III. Application of the "Incidence Test"

Given the close political and legal similarities between Canada and the United States, it seems antithetical to ever deny extradition to Canada based on the political offense exception. Unlike some other countries, Canada can hardly be characterized as an unjust or oppressive nation where defendants may be subjected to unfair trials and punishments because of their political opinions. Nevertheless, the Extradition Treaty contains the political offense exception, and defendant is entitled to seek its protection.

Neither the crimes for which defendant was convicted nor his parole violation constitute pure political offenses. Defendant was convicted of the common crimes of illegal weapon possession and endangering lives by discharging a weapon and is accused of violating his parole by leaving Canada without permission. These crimes do not fall in the same category as treason, sedition and espionage. Instead, defendant's crimes and parole violation fall into the category of relative political offenses. Therefore, this court must apply the "incidence test."

### A. "Incidental to"

■ The second component of the "incidence test," that the charged offenses be "incidental to, in the course of, or in furtherance of an uprising or violent political disturbance," is easy to analyze in this case. The Ninth Circuit applies "a rather liberal standard" of nexus. *Quinn*, 783 F.2d at 809. Under this standard, "neither proof of the potential or actual effectiveness of the actions in achieving the group's political ends, nor proof of the motive of the accused, or the requesting nation, is required. Nor is the organization or hierarchy of the uprising group or the accused's membership in any such group determinative." *Id* (citations omitted). This requirement "must be applied in an objective, non-judgmental manner" and may include attacks on civilian targets. *Id* at 810. "All that the courts should do is determine whether the conduct is related to or connected with the insurgent activity." *Id.*

■ Assuming that the Lake Gustafsen incident was an "uprising or violent political disturbance," then the "incidental to" requirement is easily satisfied in this case. Defendant is not only accused, but convicted, of two offenses which occurred during the Lake Gustafsen incident and which are directly related to the armed confrontation with the RCMP. He also proudly admits that he was a member of the insurgent group which defended the encampment to achieve a political end, namely sovereignty of native people over sacred tribal land. His later parole violation for which Canada seeks extradition is based upon his earlier convictions and therefore also is "incidental to" the Lake Gustafsen incident.

---

**6.** Applying the political offense exception, several earlier decisions by United States courts beginning in 1979 denied extradition of members of the PIRA to the United Kingdom. *See In the Matter of Extradition of Smyth*, 61 F.3d 711, 714 (9th Cir.1995), amended 73 F.3d 887 (9th Cir.1995), *cert denied* 518 U.S. 1022, 116 S.Ct. 2558, 135 L.Ed.2d 1076 (1996) (listing decisions). These decisions raised the ire of both the British government, which condemned the decisions as condoning terrorism, and the United States Departments of Justice and State, which feared that such decisions would have an adverse effect on law enforcement and foreign relations. *Id.* As a result, the United States and the United Kingdom adopted a Supplementary Treaty of June 25, 1985 (ratified July 17, 1986) in an effort to resolve increasing tensions arising from a series of extradition decisions by United States courts. *Id.* The Supplementary Treaty, among other changes, limits the scope of the political offense exception. Quinn would be extraditable under the revised extradition treaty between the United States and the United Kingdom.

## B. *"Uprising"*

In contrast, the first component of the "incidence test," requiring that defendant's crimes occur during an "uprising or other violent political disturbance," gives this court pause. *Id* at 797. The political disturbance must be "related to the struggle of individuals to alter or abolish the existing government in their country" and is "both temporally and spatially limited." *Id* at 817. It includes political acts "when a certain level of violence exists and when those engaged in that violence are seeking to accomplish a particular objective" and excludes "political acts that involve less fundamental efforts to accomplish change or that do not attract sufficient adherents to create the requisite amount of turmoil." *Id* at 807. In other words, it limits the "political offense" exception to its historic purpose of protecting "those engaged in internal or domestic struggles over the form or composition of their own government, including, of course, struggles to displace an occupying power." *Id.* Simply put, "it refers to a people *rising up*, in their own land, against the government of that land." *Id* at 813 (emphasis in original). Applying that standard, no uprising occurs when a PLO member enters Israel and commits unlawful acts. "The plain fact is that the Israelis are not engaged in revolutionary activity directed against their own government. They are not seeking to change its form, structure, or composition through violent means." *Id* at 807.

The crime for which Canada seeks extradition is a parole violation based on defendant's change of residence to the United States without permission. That crime clearly was not committed as part of any "uprising or other violent political disturbance." However, defendant's move to the United States constitutes a crime only because he was previously convicted and sentenced for crimes committed during the Lake Gustafsen incident. Therefore, the parole violation is inextricably intertwined with the previous crimes. The fact that defendant came to the United States after his convictions and partial service of his sentence places him in substantially the same position as if he had fled Canada before his convictions or after escaping from prison.

Defendant characterizes the Lake Gustafsen incident as a part of a 1995 uprising based on the resistance of native people to the dispossession of their lands dating back to the beginning of European colonialism in 1492. That resistance movement includes such modern-day confrontations as the "fish-ins" in Washington state in the late 1960's, the incident at Wounded Knee in 1973, the civil war on the Pine Ridge reservation in South Dakota in the mid–1970's, the arrest, extradition, and conviction of Leonard Peltier for the deaths of two FBI agents at the Pine Ridge reservation, the armed confrontation at Anicinabe Park in Kenora, Ontario, in 1974, the Oka crisis of 1990, and the Peigan Lonefighters stand in southern Alberta in 1990.

In his lengthy and partisan discourse dated September 12, 2000, Anthony James Hall, an Associate Professor of Native American Studies at the University of Lethbridge, Alberta, Canada, describes the political nature of defendant's conduct in the context of a larger uprising of native people seeking sovereignty, protection from genocide, and recognition of jurisdictional claims. Defendant's Exhibit H. He concludes that:

> the charges and conviction placed on [defendant] were manifestly of a political character. Indeed, the inter-related standoffs at Ipperwash and Gustafsen Lake became extremely charged political events, where the police, the military and many of the media reporters covering the event became ensnared in a complex web of inter-connected political agenda.

*Id* at 2.

From defendant's viewpoint, the Lake Gustafsen incident was not only an at-

tempt to displace an occupying power from sacred tribal burial ground, but also was part of a larger uprising in the summer of 1995 in Canada seeking sovereignty by indigenous peoples over their unceded lands. Whereas Canada and the provincial governments desired to continue negotiations with the tribal chiefs to resolve the issue of unceded lands, the Ts'peten Defenders viewed the tribal chiefs as government collaborators and desired to move the land claims and other issues to an international arena with a third-party resolution process. *See* Defendant's Exhibit L–1 to L–5.

In contrast, the government characterizes the Lake Gustafsen incident as simply a land dispute without the requisite level of violence or number of adherents necessary to rise to the level of an uprising for the political offense exception. The Canadian government has submitted no evidence concerning the events of the summer of 1995 and the United States government submits only the Declaration of Paul Saxton of the United States Department of State (Office Director for the Office of Canadian Affairs, Bureau of Western Hemisphere Affairs), stating that "[i]n the view of the Department of State, there was no violent political disturbance of such a degree as to constitute a civil war, violent insurrection, revolution or rebellion in Canada in 1995." The government also contends that defendant and his group had no intention to alter or abolish the Canadian political system.

Defendant's crimes at Lake Gustafsen do not fall in the extraditable category of crimes against humanity, acts of international terrorism, or purely personal non-political acts of violence. Nor, as defendant readily concedes, were the events at Lake Gustafsen part of a civil war or revolution, in the sense of the Civil War in the United States or the Mexican revolution. Although defendant and the other Ts'peten Defenders deeply distrusted the political and judicial leadership of the Canadian government, as well as their own

tribal leaders whom they rejected as government collaborators, and were dissatisfied with the on-going treaty process, they did not seek to overthrow the entire Canadian government. This court has not been provided with any written ultimatum or demand by the Ts'peten Defenders, but it is clear that they occupied tribal lands to achieve the political goal of achieving native sovereignty over those lands. In his summation at his trial on April 25, 1997, defendant expressed a desire not only for an independent third party resolution process, as sought in Clark's petition, but also for sovereignty:

> It is my duty to our ancestors to maintain our stolen lands and keep these traditions for the benefit of present and future generations ... We still have our sovereign nations ... The First Nations do not want the DIA [Department of Indian Affairs] to have control over us any more. We are talking about sovereignty for our people and lands.

> \*      \*      \*      \*      \*      \*

> Most of our people here are involved in movements: they seek freedom. The right to maintain their identity and live on their land and to break free from the chains of colonialism. We know that our future survival depends on our present abilities to secure not only our lands, but also the recognition of our inherent right of self-rule.

> \*      \*      \*      \*      \*      \*

> [T]he only real opportunity for first nations peoples to start on the road to recovery is to persuade the Canadian public and governments to respect us and our lands not just as individuals but as distinct peoples with traditional territories that is [sic] still rich with natural resources.

> \*      \*      \*      \*      \*      \*

> The Canadian legal system, it does not work for us, all my people seek is Freedom, the opportunity and capacity to exercise our inherent jurisdiction and

self-governing and Justice within our traditional territories.

\*　　\*　　\*　　\*　　\*　　\*

Sovereignty is the issue, Canada's the problem. Honour the Royal Proclamation of 1763.

Defendant's Exhibit L–3, L–4, & L–5.

The Lake Gustafsen incident falls somewhere along the spectrum between nonextraditable crimes committed during a civil war intended to overthrow the government, and extraditable crimes committed during lesser forms of conflict. The definition of a political offense of necessity must be flexible given the changing modes of resistance to political oppression. In a modern industrial state, political opposition takes many forms, including attempts to rouse the populace from apathy to action. The challenge for the courts is to draw the line between greater and lesser forms of conflict without according weight to the political undesirability of the person sought to be extradited, the atrocity of the crime, or the political climate of the moment.

■ Because defining a political offense "is itself a political act, changing with the nature of the extraditing nation's foreign relations and treaties," this court must take into account the views of the United States State Department. *Ahmad v. Wigen*, 726 F.Supp. 389, 402 (E.D.N.Y. 1989), *aff'd* 910 F.2d 1063 (2nd Cir.1990); *Eain*, 641 F.2d at 515 ("Even though we do not leave sole determination to the Executive branch, we believe its views are entitled to great weight in extradition matters"). Here the State Department has taken the position that the Lake Gustafsen incident was not a " violent political disturbance of such a degree as to constitute a civil war, violent insurrection, revolution or rebellion in Canada in 1995." However, that position not only is conclusory without any supporting facts, but also fails to fully address the Ninth Circuit's "incidence test." Although *Quinn* requires "a certain level of violence" for the uprising compo-

nent, it does not define that level of violence solely as a "civil war, violent insurrection, revolution or rebellion."

Harking back to the language in *Quinn*, the political offense exception protects "a people *rising up*, in their own land, against the government of that land." *Quinn*, 783 F.2d at 813 (emphasis in original). The uprising must be "both temporally and spatially limited" and involve "a certain level of violence" by those "seeking to accomplish a particular objective." *Id* at 807, 817. The Lake Gustafsen incident easily satisfies many of these criteria.

The Lake Gustafsen incident involved indigenous people rising up in their own land against the government of that land. Although the crimes were committed while trespassing and occupying private property, the type of property occupied makes this case unique. James acquired title to the land through the Canadian government, but his land included tribal land over which native people believed they had a valid legal claim. Thus, the protest by the Ts'peten Defenders was directed largely against the Canadian government which had granted title to James, not against James. In addition, the violence was aimed not at James, but at the Canadian government and its military forces.

Furthermore, the Lake Gustafsen incident was temporally and spatially limited and sought to accomplish a particular objective. The actions by defendant and other activists in 1995 clearly played a role in prompting Canada and British Columbia in 1996 to begin intensive negotiations with more than 40 Indian councils and nations. As a result of the negotiations, the Nisga'a tribe received fishing and forestry rights as well as the ability to set up its own government, policing, and courts. Those treaty negotiations may not have occurred or been successful without the impetus provided by the Lake Gustafsen incident and other incidents by native people during the summer of 1995.

However, the level of violence must be sufficient to invoke the political offense exception. Arguing that the level of violence is not sufficient, the government first points to the fact that the encampment did not begin as a violent event. Nevertheless, what began as a non-violent occupation escalated into a violent confrontation because the Ts'peten Defenders were heavily armed and used those arms to fend off a military siege to accomplish their particular objective. Whether the insurgents or the government initiated the violence is not critical to application of the political offense exception.

One court has limited the political offense exception to "a violent political disturbance of such a degree as to constitute in effect a state of civil war." *Ahmad*, 726 F.Supp. at 408. However, that standard is different than set forth by the Ninth Circuit in *Quinn* and appears to be aimed at narrowing the political offense exception to exclude crimes committed against civilians. In any event, *Ahmad* found that in April 1986 when the accused firebombed and fired automatic weapons against a passenger bus in territory occupied by Israel, the occupied territory was relatively peaceful, in contrast to the violence of the Intifada beginning in December 1987:

> There was no indication of violence, except for that attributed to petitioner, at the time and place where the events occurred. General opposition of the population of the territory to the occupation and the desire to terminate it is far removed from the endemic and widespread violence required to establish a political offense exception for murder. Sporadic acts of violence cannot justify deliberately waylaying a civilian bus ...

*Id* at 409.

In contrast, the Lake Gustafsen standoff was not just an isolated violent disturbance, but occurred "in a summer full of disputes between aboriginals and police across Canada." Defendant's Exhibit F. At the same time as the Lake Gustafsen incident, a similar incident was occurring at Ipperwash in Ontario and other lesser acts of violence, such as road blockades, were occurring elsewhere across Canada. It is not clear to this court what precipitated the violent events of the summer of 1995 between the native people and the Canadian government, but they were inter-related. Native people from multiple tribes undertook simultaneous, if not coordinated, action in defense of their unceded lands and in defense of their people on more than one front by petitioning the Queen of England, setting up armed encampments, creating a supply network with other tribes, overtaking a Canadian military base, and taking control of large areas of land. Although the violence of the summer of 1995 did not rise to the level of a civil war, that is not the test for an "uprising" sufficient to invoke the political offense exception.

The seriousness of the challenge to Canadian jurisdiction over unceded tribal lands is evidenced by the fact that large military forces were deemed necessary to suppress the challenge. According to the submission by Professor Hall, Canada has called its army into domestic conflicts only three times since World War II:(1) 1970 during a matter involving the Quebec independence movement: (2) 1990 during the Oka conflict; and (3) 1995 at Lake Gustafsen. Defendant's Exhibit H, p. 7. In fact, defendant claims, and the government has not disputed, that the Lake Gustafsen standoff escalated into the largest Canadian police or military operation on land since the Korean War. In addition, defendant has submitted uncontradicted evidence that the Canadian government engaged in a smear and disinformation campaign to prevent the media from learning and publicizing the true extent and political nature of the events.

Given that the level of violence is sufficient to invoke the political offense exception, the key to defendant's extradition is whether his "political acts involve less fundamental efforts to accomplish change" or "do not attract sufficient adherents to cre-

ate the requisite amount of turmoil." *Quinn*, 783 F.2d at 807.

The Lake Gustafsen standoff involved more than just the 18 native people who surrendered and were convicted of various crimes. Although the number at the encampment was small, perhaps around 40 at the most, support came from an unspecified number of native and non-native organizations and individuals. *See* Defendant's Exhibits I & J. Clearly not all native people supported the defense of the encampment at Lake Gustafsen. Organized tribal governments went on record opposing it, and the Ts'peten Defenders did not purport to represent the majority of native people.

However, it is far from clear how many adherents to a rebel movement are required to invoke the protection of the political offense exception. This court has found little guidance in the American case law, and has found only one case from Canada touching upon this issue. After analyzing British and American cases, including *Quinn*, *Gil v. Canada*, 1994 Can F C LEXIS 171, 1 Can F C 508 (Fed Ct of Canada, Court of Appeal, Montreal, 1995), applied the "incidence test" to an Iranian citizen who, during 1980 and 1981, joined an underground student group and became involved with a larger militant group of anti-Khomeini activists in bombing and arson incidents directed against wealthy supporters of the regime. The court concluded that the first component of the "incidence test" was met because "Iran was a turbulent society in which a number of armed groups were in conflict with the Khomeini regime." *Id*, 1994 Can F C LEXIS at 53–54, 1 Can F C at 533. However, it allowed extradition for failure to meet the second component of the "incidence test" because the attacks were not carried out against armed adversaries.

In comparison, defendant also joined a militant group of activists seeking to oust Canadian control of tribal lands. Other armed (and presumably unarmed) native groups also were engaged in the same conflict during the summer of 1995, although apparently not to the same extent as the anti-Khomeini activists, and were met with armed government resistance.

This court recognizes that Canada has extradited a Native American activist to the United States for crimes committed in the United States.[7] Leonard Peltier was a prominent leaders of the American Indian Movement ("AIM"), an organization dedicated to "encourage self-determination among American Indians and to establish international recognition of American Indian treaty rights." Privitera, John J., "Toward a Remedy for International Extradition by Fraud: The Case of Leonard Peltier," 22 YALE LAW & POLICY REVIEW 49, p. 50 (1963) ("Privitera"). He fled to Canada after being charged with the murder of two FBI agents at the Pine Ridge Reservation in South Dakota in 1975. The Canadian tribunal ruled that Peltier should be extradited to the United States, to a large extent on the basis of what subsequently turned out to be false affidavits. *United States v. Peltier*, 585 F.2d 314, 335 (8th Cir1978), *cert denied* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). He sought review by the Canadian Minister of Justice on the basis that he was being extradited for a political offense, but the Minister refused relief. Privitera, at 52–53. Unfortunately, this court has been unable to determine why Canada deemed the political offense exception inapplicable. However, the context of the Peltier's crimes differs markedly from that of defendant's crimes. In an effort to alleviate conflict between those members of the Pine Ridge Reservation who supported the tribal government and those who supported AIM, the tribal elders had invited

---

7. Another Native American activist, Robert Satiacum (hereditary Chief of the Puyallup Indians), escaped to Canada after being convicted of various crimes in the United States.

He obtained asylum in Canada as a refugee. *Satiacum v. Canada*, 7 Imm L R 2d 178 (Imm App Bd, July 10, 1987).

Peltier and other AIM members to stay at the reservation. *Peltier,* 585 F.2d at 318. Two FBI agents entered the reservation to locate and arrest four individuals who were charged with armed robbery and assault. *Id.* The murders of the FBI agents clearly were not committed as part of a direct confrontation against the government for political reasons. Thus, it is not surprising that Peltier was unable to invoke the political offense exception to prevent extradition.

█ As *Quinn* noted, not all offenses are political offenses, even if committed for a political reason. To qualify for the political offense exception, insurgents must direct their offense against the state "to change their governments," *Quinn,* 783 F.2d at 804, or "to alter or abolish the existing government in their country." *Id* at 817. Defendant and the Ts'peten Defenders were not seeking to abolish the Canadian government and replace it with their own, or even to fundamentally alter the Canadian government. Instead, they sought to establish sovereignty over, and to displace the Canadian government, from their tribal lands.

In a very fundamental sense, the Lake Gustafsen incident is analogous to other separatist movements around the world, including the PIRA in Ireland, the Tamils in Sri Lanka, the Basques in Spain, as well as various insurrections in Eastern Europe and Africa. All are violent efforts by indigenous people to overthrow an occupying government in an effort to achieve self-rule. Similarly, the Lake Gustafsen incident involved an organized group of native people rising up in their homeland against the occupation by the government of Canada of their sacred and unceded tribal land. They sought to regain sovereignty by ousting the occupation and control of the Canadian government to those lands. If the Quebec separatist movement in Canada resorted to violence, then it could easily fall into the same category. Quebec separatists do not seek to abolish the government of Canada, but instead seek to displace the Canadian government from controlling Quebec, just as defendant and others involved in the events of the summer of 1995 sought to displace control of the Canadian government over unceded tribal lands.

As the government argues, the Lake Gustafsen incident and other incidents during the summer of 1995 were directed against a governmental policy regarding title to unceded aboriginal land. However, to characterize the Ts'peten Defenders as engaged in a mere land dispute or disagreement with government policy is to trivialize the nature of the controversy. Control over land is one of the primary reasons for the existence of a government and often is the cause of wars between nations. Given its substantial economic consequences, the aboriginal land title question in Canada clearly is a highly charged issue for both native and non-native people.

The Lake Gustafsen incident may be easily contrasted with the "sit-ins" and other protests on college campuses and elsewhere which protested the military involvement of the United States government in Vietnam in the 1960's and 1970's in this country. A sizeable segment of the population opposed the Vietnam War and engaged in peaceful protests, some of which turned violent, most notably at Kent State in Ohio. Those protests were not aimed at abolishing the United States government or altering citizens' political relationship with the government, but at changing its foreign policy. Crimes committed during such protests can not be characterized as non-extraditable political offenses under *Quinn.* Here, in contrast, defendant and the Ts'peten Defenders were attempting to alter their political relationship with the Canadian government by regaining the right of self-government over their own lands.

Crimes committed during the Civil Rights Movement of the 1960's and 1970's in the United States also provide a close, but not precise analogy. African-Americans did not advocate for a separate nation, but worked within the system to enforce existing laws and to pass

new legislation guaranteeing their equal rights. Therefore, their crimes would not be protected by the political offense exception. In contrast, defendant and the Ts'peten Defenders were advocating for self-determination over unceded tribal lands.

The Lake Gustafsen incident was not an isolated violent incident incited by a mere handful of insurgents, as contended by the government. Instead, according to the evidence submitted by defendant, it was part of a broader protest in 1995 aimed at the Canadian government in support of sovereignty by the native people over their land. The trespassing dispute was an opportunity for the native people to affirm their sovereignty against the Canadian government, which, if successful, could have dramatically altered the political landscape of Canada. As the sentencing judge readily acknowledged, the Lake Gustafsen incident began as a form of civil protest that crossed the line into criminal activity. Government's Exhibit C, p. 24. In fact, it appears that had the judge allowed the "colour of right" defense, then defendant may well have been acquitted. Defendant's Exhibit L–14. The "colour of right" defense is available to a person who truly believes that he is acting within the law and was used to acquit many of those charged in the Ipperwash incident. Defendant's Exhibit L–10.

Although Canada seeks defendant's return only for a parole violation, this court concludes that defendant's crimes for which he was convicted and later paroled were "of a political character" and therefore may not provide the basis for extradition of defendant to Canada. Extradition Treaty, Art. IV(1)(iii).

### ORDER

For the foregoing reasons, the government's request for extradition is denied and the Complaint is dismissed.