**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VAN DUC VO, a/k/a Vo Van Duc,
Nguyen Tran Van and Trang Van
Nguyen,
　　　　　*Petitioner-Appellant,*

　　　　　v.

MICHAEL L. BENOV, Warden,
　　　　　*Respondent-Appellee.*

No. 04-56689

D.C. No.
CV-04-05543-DDP

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
July 11, 2005—Pasadena, California

Filed May 22, 2006

Before: Stephen Reinhardt, Alex Kozinski, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

W. Michael Mayock, Law Offices of W. Michael Mayock, Pasadena, California, for the appellant.

Debra W. Yang, United States Attorney, Steven D. Clymer, Special Assistant United States Attorney, Daniel S. Goodman, Assistant United States Attorney, Los Angeles, California, for the appellee.

## OPINION

REINHARDT, Circuit Judge:

Van Duc Vo, a naturalized U.S. citizen fighting extradition to Thailand, appeals an order of the district court denying his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2241. Vo asserts that the crime with which he was charged was a political offense and thus not a valid basis for extradition under the terms of the extradition treaty between the United States and Thailand. He also contends that the extradition court violated his due process rights by failing to make a finding whether he had been "proceeded against" under the terms of the treaty and by not denying his extradition on that ground. Because we find that the crime with which Vo was charged is not protected by the political offense exception and that Vo's arguments as to the "proceeded against" clause of the treaty do not present a claim that is cognizable on this appeal, we affirm the district court.

## I. Background

### A. The Extradition Process

An extradition court — in this case the magistrate judge — exercises very limited authority in the overall process of extradition. As we have explained, "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir. 1997) (citing *In re Metzger*, 46 U.S. (5 How.) 176,

188 (1847)). Extradition from the United States is initiated when the nation seeking extradition makes a request directly to the State Department. *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1207 (9th Cir. 2003). "After the request has been evaluated by the State Department to determine whether it is within the scope of the relevant extradition treaty, a United States Attorney . . . files a complaint in federal district court seeking an arrest warrant for the person sought to be extradited." *Id.* Upon the filing of a complaint, a judicial officer (typically a magistrate judge) issues a warrant for an individual sought for extradition, provided that an extradition treaty exists between the United States and the country seeking extradition and the crime charged is covered by the treaty. 18 U.S.C. § 3184. After the warrant issues, the judicial officer conducts a hearing to determine whether there is "evidence sufficient to sustain the charge under the provisions of the proper treaty or convention," *id.*, or, in other words, whether there is probable cause.

If the judicial officer determines that there is probable cause, he "*is required to certify* the individual as extraditable to the Secretary of State." *Blaxland*, 323 F.3d at 1208 (emphasis added) (citing *Lopez-Smith*, 121 F.3d at 1326). After an extradition magistrate certifies that an individual can be extradited, it is the Secretary of State, representing the executive branch, who ultimately decides whether to surrender the fugitive to the requesting country. *Id.*; *see Quinn v. Robinson*, 783 F.2d 776, 789 (9th Cir. 1986).[1] The authority of a magistrate judge serving as an extradition judicial officer is thus limited to determining an individual's eligibility to be extradited, which he does by ascertaining whether a crime is

---

[1]As we noted in *Blaxland*, "It is a generally established principle . . . that the Secretary of State, exercising executive discretion through delegation of this authority by the President, may refuse to extradite a relator despite a judicial determination that extradition would be compatible with the terms of the applicable treaty." *Id.* at 1208 (internal quotations and citations omitted).

an extraditable offense under the relevant treaty and whether probable cause exists to sustain the charge. *See Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005); *Blaxland*, 323 F.3d at 1208 (quoting *United States v. Lui Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997). Part of determining whether the offense is extraditable is examining whether it falls within the political offense exception. If it does, the individual is not eligible for extradition. *Quinn*, 783 F.2d at 787.

## B. *The Extradition Treaty*

The United States signed an extradition treaty with Thailand in 1983. Three articles of the treaty are relevant to Vo's appeal. As is typical of many extradition treaties, the Thai treaty contains a "political offense" exception. In Article 3, the treaty provides that "[e]xtradition shall not be granted when: (a) the offense for which extradition is sought is a political offense; or (b) it is established that extradition is requested for political purposes." Treaty Between the Government of the United States of America and the Government of the Kingdom of Thailand Relating to Extradition, Dec. 14, 1983, U.S.-Thail., 1983 U.S.T. LEXIS 418 [hereinafter Treaty], at art. 3(1). Two other articles in the Treaty describe circumstances in which the requested state may choose to deny extradition. Article 4 states, "[t]he Requested State may refuse to extradite a person claimed for a crime which is requested by its laws . . . provided it shall proceed against the person for that crime according to its laws." Article 5(2) states, "[e]xtradition may be denied when the person sought is being or has been proceeded against in the Requested State for the offense for which extradition is requested."

## C. *Vo's Offense*

Vo, a naturalized United States citizen who was born in Vietnam, came to the United States in 1980 to escape the regime in his home country. Vo belongs to the Government of Free Vietnam (GFVN), based in Garden Grove, California,

which Vo asserts is "an organization deemed a terrorist entity by both Vietnam and the United States." The stated purpose of the GFVN is to "[d]ismantle the Communist dictatorship of the Socialist Republic of Vietnam by a peaceful, practical and persistent approach." Although the GFVN insists that its activities are peaceful, its members have been linked to several incidents of terrorism in Vietnam and elsewhere.

In 2001, Vo visited Thailand. Between June 15, 2001 and June 19, 2001, Vo and an accomplice jointly devised a plan to plant explosives at the Vietnamese embassy in Bangkok. Early in the morning of June 19, the anniversary of the formation of the South Vietnamese Army, Vo and his accomplice met and, carrying two bags and one backpack, took a taxi to the embassy. On the way, Vo took one bag and separated from the accomplice, but instructed the accomplice to take the remaining packages — which contained ammonium nitrate and diesel fuel, the explosive mixture known as ANFO that was used in the 1995 Oklahoma City bombing — and implement their plan to bomb the embassy. At around 4 a.m., Vo's accomplice arrived at the Vietnamese embassy in Bangkok with the two packages. He placed one, a box containing approximately three kilograms of ANFO, just outside the perimeter wall of the embassy, and threw the other, a backpack containing approximately five kilograms of the material, over the wall. The bombs included cell phones that were wired to function as triggers when called. Subsequent investigation showed that Vo's accomplice called the cell phones connected to the bombs after he delivered them to the embassy, but that the bombs failed to detonate. Vo flew to Los Angeles later that day.

Shortly after the attempted bombing, Thai police arrested Vo's accomplice, Phan Nguyen Thanh Si. In a statement to police investigators, Si implicated Vo as the organizer of the crime. Si's confession also associated the GFVN with the bombing attempt. Further police investigation revealed that Vo's latent fingerprints were on some papers inside one of the

packages, and that Si and Vo had been seen buying the cellular phones that were found connected to the bombs. Although Vo does not deny being involved in the bombing plot, there is some dispute over whether he intended the bombs to explode. Vo claims that he decided at the last minute not to detonate the explosives, and, to that end, he had ensured that the detonators were removed and that the ignition match and the gunpowder were wet. He contends that he arranged for the planting of the bombs at the embassy only so that "the repressive Communist government of Vietnam would be sent a message they would understand." However, Si's confession states that Vo told him "to ignite" the bombs, and Thai forensic examiners determined that the bombs were still capable of going off at the time they were found. It is undisputed that had the bombs exploded, they were powerful enough to kill or injure people within a 10-15 meter (approximately 33-39 feet) radius.

## D. Proceedings Below

Vo was arrested in California in October 2001, and he has been detained without bail ever since. Initially, charges were brought against him in the Central District of California for conspiring to use a weapon of mass destruction outside the United States in violation of 18 U.S.C. § 2332a(b). Vo consented to an information instead of an indictment because he intended to plead guilty to the charge, but plea negotiations fell apart and a criminal trial was scheduled. However, in June 2002, following the commencement of extradition proceedings, the U.S. Attorney's office, pursuant to a request from Thailand, moved for dismissal of the criminal charge and the district court granted the motion. That month, the United States filed a complaint seeking an extradition arrest warrant for Vo. The warrant was issued and Vo, already in custody on the United States criminal charge, was arrested on that warrant. In August, the United States filed the formal complaint on behalf of the government of the Kingdom of Thailand

seeking Vo's extradition pursuant to the extradition treaty between the two countries.[2]

Vo opposed his extradition on multiple grounds, including that (1) the acts in question were not extraditable because they fell under the political offense exception to the treaty; and (2) he had been "proceeded against" by the United States and hence his extradition should have been denied under Article 5 of the Treaty.[3] After an extradition hearing, the magistrate judge serving as the extradition court certified Thailand's request for extradition to the Secretary of State. He found that Vo had not met his burden of showing that the political offense doctrine applied to his crime. He also summarily rejected Vo's arguments that he was ineligible for extradition because he had been "proceeded against" in the United States. The magistrate judge concluded that he did not possess the authority to address that argument, as only the executive — not the courts — could deny extradition on the ground that Vo had already been "proceeded against."

Vo then petitioned the district court for a stay of extradition and a writ of habeas corpus. In his claims relevant to this appeal, Vo argued that the magistrate judge erred when he determined that the bomb plot was not protected by the political offense exception. He also reasserted his due process claim based on the magistrate judge's failure to construe or apply Article 5 of the extradition treaty. The district court denied Vo's petition. The court ruled that the magistrate judge did not clearly err in finding that the "uprising" prong of the test for applying the political offense exception had not been met. As to the Article 5 claim, the court disagreed with the

---

[2]Thailand accuses Vo of "jointly acting with the other accused in an attempt to cause an explosion likely to cause injury to the other person or a thing belonging to the other person" and of "making, having in possession and using explosive devices" in violation of the Thai Penal Code.

[3]Vo opposed his extradition on other grounds as well, but on appeal he does not raise any issues other than the two described above.

magistrate that the interpretation of that article rested solely with the executive branch. The district court held that interpretation of the phrase "has been proceeded against" in Article 5(2) is "properly within the judiciary's review." It concluded, however, that because the treaty gave the executive branch the ultimate discretion over whether or not to extradite someone who had met the requirements of that clause, the magistrate did not violate Vo's due process rights by not construing or applying Article 5(2). The court made no ruling on whether Vo had in fact "been proceeded against." Vo filed a timely appeal of the district court's order.

## II.   Jurisdiction and Standard of Review

The decision to certify an individual as extraditable cannot be challenged on direct appeal. Rather, a habeas petition is the only available avenue to challenge an extradition order. *Mainero v. Gregg*, 164 F.3d 1199, 1201-02 (9th Cir. 1999). The district court's habeas review of an extradition order is limited to whether: (1) the extradition magistrate had jurisdiction over the individual sought, (2) the treaty was in force and the accused's alleged offense fell within the treaty's terms, and (3) there is "any competent evidence" supporting the probable cause determination of the magistrate. *Id.* at 1205; *Quinn*, 783 F.2d at 790. We have held that "the political offense question is reviewable on habeas corpus as part of the question of whether the offense charged is within the treaty." *Id.* at 791. This factor is a mixed question of law and fact. *Id.* Mixed questions are reviewed de novo, though we cautioned in *Quinn* that if "the determination is 'essentially factual' . . . it is reviewed under the clearly erroneous standard." *Id.* (citing *United States v. McConney*, 728 F.2d 1195, 1203 (9th Cir. 1984) (en banc)).

## III.   Discussion

Vo's appeal is limited to two issues. First, he claims that the bombing plot was a political offense, incidental to an

uprising against the government of Vietnam, and thus it is not a valid basis for extradition. Second, he asserts that the magistrate judge denied him due process by failing to deny his extradition because he had been "proceeded against" in the United States or at the least by failing to make a determination whether he had been "proceeded against." Vo asserts that the magistrate judge was required to make the latter ruling in order to aid the Secretary of State in the exercise of her discretionary authority. We reject these arguments and affirm the district court's denial of Vo's petition.

## A.   The Political Offense Doctrine

**[1]** The political offense doctrine covers two types of crimes. *Quinn*, 783 F.2d at 793. The first are "relative" political offenses, which are " 'otherwise common crimes committed in connection with a political act,' or 'common crimes . . . committed for political motives or in a political context.' " *Id.* at 794 (citations omitted) (alteration in original). For this type of crime, we use the two-prong "incidence" test to decide whether a crime falls under the political offense exception. *Id.* The second are "pure" political offenses, such as treason, sedition, and espionage. *Id.* at 793-94. Because these crimes are by definition political, courts generally do not apply the incidence test to them. *Id.* at 794. Vo's offense is of the first type, and thus the incidence test applies.

**[2]** We explained the requirements of the incidence test in *Quinn*, *id.* at 794-811, which this court, sitting en banc, recently reaffirmed in *Barapind v. Enomoto*, 400 F.3d 744, 750-51 (9th Cir. 2005) (en banc) (per curiam). For a crime to qualify for the political offense exception under the incidence test, there must be "(1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense, and (2) a charged offense that is 'incidental to' 'in the course of,' or 'in furtherance of' the uprising." *Quinn*, 783 F.2d at 797 (quoted in *Barapind*, 400 F.3d at 750) (internal citations omitted).

**[3]** The uprising prong constitutes the critical part of the incidence test. *See Quinn*, 783 F.2d at 806 ("[I]t is the 'uprising' component that plays the key role in ensuring that the incidence test protects only those activities that the political offense doctrine was designed to protect."). This prong has a number of facets that must be satisfied in order for an individual's conduct to be protected by the political offense exception. First, a "certain level of violence" must exist for the uprising prong to be satisfied. *Id.* at 807. Second, the prong involves a geographic limitation. An uprising "can occur only within the country or territory in which those rising up reside," and the charged offense must take place in that geographic area. *Id.* at 807 ("[T]he uprising component serves to exclude from coverage under the exception criminal conduct that occurs outside the country or territory in which the uprising is taking place."). This limitation ensures that the political offense exception will not serve to protect international terrorism. *Id.* at 813-14 ("[T]he word 'uprising' . . . does not cover terrorism or other criminal conduct exported to other locations.").[4] Third, the individual charged with the offense must be "seeking to change the form of the government under which [he] live[s]." *Id.* at 818. If the individual's conduct does not meet these criteria, the individual does not qualify for the political offense exception.[5] Because the level of vio-

---

[4]*See also Quinn*, 783 F.2d at 807 ("The political offense exception was designed to protect those engaged in internal or domestic struggles over the form or composition of their own government, including, of course, struggles to displace an occupying power. It was not designed to protect international political coercion or blackmail, or the exportation of violence and strife to other locations.").

[5]The government points to another potential facet of the uprising prong: the political offense exception cannot apply where the government seeking extradition is not the same as the government against which the political violence is aimed. In support, it cites *Quinn*, which states that "in cases of international terrorism, we are being asked to return the accused to the government in the country where the acts were committed: frequently that is not a government the accused has sought to change." 783 F.2d at 806. Neither the district court nor the magistrate judge directly addressed this facet of the doctrine, and it is unnecessary to reach it here as Vo fails to satisfy the uprising prong of the incidence test for other reasons.

lence in Vietnam falls far short of that required to qualify as an uprising, we hold that Vo's offense is not protected by the political offense exception to the Treaty. In the alternative, we hold that Vo does not qualify for the exception because his conduct does not satisfy the geographic requirement of the uprising test.

## 1.   "A Certain Level of Violence"

The degree of violence in Vietnam at the time of Vo's conduct does not reach the level necessary to characterize it as an "uprising." *Quinn* described an uprising as synonymous with "rebellion" or "revolution" and involving "a certain level of violence." 783 F.2d at 807. The term does not "apply to political acts that involve less fundamental efforts to accomplish change or that do not attract sufficient adherents to create the requisite amount of turmoil." *Id.* Rather, an uprising "refers to a people *rising up*, in their own land, against the government of that land." *Id.* at 813.

**[4]** The application of this facet of the uprising prong in other cases clearly demonstrates that the degree of violence in Vietnam at the time of the offense did not reach the level of an uprising. In *Quinn*, we held that an uprising occurred in Northern Ireland because there had been "a number of bombing campaigns" during a very long and frequently violent period of conflict between Irish nationalists and the United Kingdom. *Id.* at 812-13 (noting the Provisional Irish Republican Army, of which Quinn was a member, "advocated armed insurrection"). More recently, we found that " '[t]ens of thousands of deaths and casualties' . . . as Sikh nationalists clashed with government officers and sympathizers in Punjab" constituted "[s]ubstantial violence" sufficient to rise to the level of an uprising. *Barapind*, 400 F.3d at 750. Similarly, a continuing clash between indigenous people and police in northern Canada that was "not just an isolated violent disturbance" but part of a long history of struggle between native people and the government of Canada was found to constitute an upris-

ing. *United States v. Pitawanakwat*, 120 F. Supp. 2d 921, 935 (D. Or. 2000).[6] Other courts analyzing the uprising prong have looked for "endemic and widespread violence." *Ahmad v. Wigen*, 726 F. Supp. 389, 409 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990) (holding that violence against Israeli settlers in the West Bank, before the Intifada of the 1980s, was not an uprising). The analysis in these cases shows that in order to constitute an uprising, a conflict must involve either some short period of intense bloodshed or an accumulation of violent incidents over a long period of time. *Barapind*, 400 F.3d at 750; *Quinn*, 783 F.2d at 812.

[5] The burden of proving the existence of a campaign against the Vietnamese government that involves sufficient violence to rise to the level of an uprising is on Vo, the party presenting an affirmative defense to extradition.[7] Vo has not met this burden. In support of his claim that an uprising exists in Vietnam, Vo cites the thousands of signatures on a petition for his freedom as evidence of a "war" between the GFVN and Vietnam. He claims that "GFVN members [have been] murdered and imprisoned for their actions," and points to a handful of attacks against the Vietnamese government that GFVN has attempted or carried out. He further notes that Vietnam "consider[s] Vo a terrorist." The exhibits that Vo has presented are not particularly convincing. Furthermore, even if we construe all the evidence in his favor, Vo still cannot

---

[6]The district court there stated that:

> Native people from multiple tribes undertook simultaneous, if not coordinated, action in defense of their unceded lands and in defense of their people on more than one front by petitioning the Queen of England, setting up armed encampments, creating a supply network with other tribes, overtaking a Canadian military base, and taking control of large areas of land.

*Pitawanakwat*, 120 F. Supp. 2d at 935.

[7]*See, e.g.*, *Pitawanakwat*, 120 F. Supp. 2d at 928 ("The initial burden of proof is on defendant to establish the essential elements of the political offense exception.").

show a sustained and widespread degree of violence that rises to the level of an uprising. The sum of a few skirmishes with the police, coupled with a handful of explosions and bombing attempts around the Pacific Rim and a keen desire to see the downfall of the communist regime in Saigon, does not amount to an uprising. Because the events relied on by Vo do not reach the necessary level of violence, he cannot meet this critical component of the uprising prong. Thus, his conduct is not protected by the political offense exception.

## 2.   *The Territory of the Uprising*

Even were we to consider the level of violence in Vietnam at the time of Vo's conduct sufficient to constitute an uprising, Vo still would not qualify for the political offense exception because his crime did not occur "within the country or territory in which those rising up reside," as required by the incidence test. *Quinn,* 783 F.2d at 807.

Vo offers two different arguments in support of his contention that he satisfies the geographic requirement of the uprising prong. First, Vo argues that under *Quinn*, the territorial restriction of the incidence test need not be strictly applied. Vo places great weight on language in *Quinn* that he characterizes as a "savings clause." The portion of *Quinn* on which Vo relies states that "[w]hile determining the proper geographic boundaries of an 'uprising' involves a legal issue that ordinarily will be fairly simple to resolve, there may be some circumstances under which it will be more difficult to do so. We need not formulate a general rule that will be applicable to all situations." 783 F.2d at 807. Vo argues that in light of this alleged "savings clause," the "symbolic" nature of both the attack's location (the embassy) and its timing (the anniversary of the founding of the South Vietnamese army) make "it . . . unreasonable to consider the attack . . . to be geographically barred." As his second argument, Vo asserts that he can satisfy even the strictest construction of the geographic requirement because the Vietnamese embassy was the target

of his attack and thus the crime occurred "in" Vietnam. We reject both of Vo's arguments.

**[6]** Vo essentially proposes that this court construe the incidence test's uprising prong as containing an amorphous exception to the geographic requirement that permits extradition courts in their discretion to deem the requirement satisfied even though the criminal act alleged occurs outside the boundaries of the state against which the uprising is directed. Such an expansive interpretation of the geographic requirement, however, is expressly precluded by the text of *Quinn*. There, we explained that:

> The term "uprising" refers to a revolt by indigenous people against their own government or an occupying power. That revolt can occur only within the country or territory in which those rising up reside. *By definition acts occurring in other lands are not part of the uprising*.

*Quinn*, 783 F.2d at 807 (emphasis added). As this explanation makes clear, offenses that occur outside the geographic boundaries of the country or territory in which those "rising up" reside cannot be considered part of an uprising for the purpose of the political offense exception.

The "savings clause" that Vo relies on is not to the contrary. The potential difficulty in "determining the proper geographic boundaries of an 'uprising,' " *id.*, refers to the challenge a court faces when an offense for which extradition is sought occurs in territory the legal status of which is unclear, including territory allegedly occupied by the requesting state (as opposed to within its formal borders). In that circumstance, the boundaries of the occupation are not fixed and may shift frequently, requiring the court to make the some-

times difficult determination whether the territory in which the offense occurred is in fact occupied.[8]

Not only does Vo's interpretation of the geographic requirement of the uprising prong conflict with the text of *Quinn*, it conflicts with the requirement's underlying purpose as well. As we have previously noted, the territorial limitation on the uprising prong plays a critical role in the political offense doctrine — it ensures that the political offense exception is not used to allow international terrorists to escape prosecution or to encourage the spread of civil insurrections to neighboring states. *Id*. at 813-14.[9] Vo's construction of the territorial restriction would extend the scope of the political offense exception to cover many acts of international terrorism. Under Vo's understanding of the geographic requirement of the uprising prong, an offense that is sufficiently "symbolic" — in terms of either its location or its timing — need not occur in the country or territory of an uprising to be protected by the political offense exception. As many acts of international terrorism are committed for their symbolism (including the September 11, 2001 attacks on the World Trade Center) and often meet the other requirements of the incidence test, Vo's interpretation would allow such acts to be covered by the political offense exception — precisely what the geo-

---

[8]We made the limited reach of the "savings clause" abundantly clear in the sentence in *Quinn* that directly follows the one quoted by Vo. The next sentence states that "for purposes of the political offense exception an 'uprising' cannot extend beyond the borders of the country or territory in which a group of citizens or residents is seeking to change their particular government or governmental structure." *Quinn*, 783 F.2d at 807.

[9]We emphasized the function of the territorial limitation of the political offense exception in *Quinn*, stating that "the word 'uprising' means exactly that: it refers to a people *rising up*, in their own land, against the government of that land. It does not cover terrorism or other criminal conduct exported to other locations." *Id*. at 813-14; *see also id*. at 805 ("The application of [the political offense] exception to acts of international terrorism would comport with neither [the original justifications for the exception or the traditional requirements of the incidence test].").

graphic limitation of the uprising prong is designed to prevent. Similarly, the requirement is intended to prevent the use of the political offense exception by those seeking to spread internal conflicts to neighboring countries and thus to turn civil insurrections into regional conflicts. The essence of the exception is to protect against extradition those trying to change their own government by actions within their own territory.[10] Accordingly, we reject Vo's effort to create a discretionary exception to the territorial component of the political offense exception.

[7] We also reject Vo's claim that when an offense is committed in another nation against the embassy of the country in which an uprising is occurring, the uprising prong's geographic requirement is met, even though the offense is committed outside of the borders of the country that is the object of the insurrection. We also reaffirm what we said in *Quinn*: in order to satisfy the geographic requirement of the incidence test's uprising prong, an offense must occur within the geographic borders of the nation at which the uprising is directed or within its occupied territory. *Id*. at 807. The geographic requirement is *not* satisfied when an offense occurs on property owned or controlled by that nation that is located within the geographic borders of another state. Because Vo committed the offense outside the territorial boundaries of the state in which the uprising was allegedly occurring, his conduct does not meet the geographic requirement of the incidence test's uprising prong, and therefore the crime does not qualify for the political offense exception.[11]

---

[10]*See id*. at 807 ("[T]he uprising component serves to exclude from coverage under the exception criminal conduct that occurs outside the country or territory in which the uprising is taking place. . . . [The political offense exception] was not designed to protect . . . the exportation of violence and strife to other locations — even to the homeland of an oppressor nation. Thus, an uprising is . . . limited spatially.").

[11]Vo must meet all the criteria of the uprising prong in order to qualify for the political offense exception. We have found that he cannot meet at least two of those criteria and thus do not reach the question whether he fails to meet other criteria of this prong or the "incidental to" prong by virtue of his citizenship or for other reasons.

*B.  Vo's Due Process Claims*

In addition to his claim that he qualifies for the political offense exception, Vo argues that we should reverse the district court's denial of his habeas petition because the extradition magistrate violated his due process rights. Vo's due process arguments are based on Article 5(2) of the extradition treaty, which permits the United States to refuse to extradite an individual if it "has proceeded against" the individual for the offense for which extradition is requested.[12] Vo raises two due process claims under this provision of the extradition treaty. First, he argues that the magistrate judge's failure to deny extradition on the ground that he had been "proceeded against" by the United States deprives him of due process. Second, he argues that the extradition magistrate's failure to make a determination of whether he had been "proceeded against" in order to aid the Secretary of State in deciding whether to exercise her discretion not to extradite him violates his due process rights. Because Article 5(2) provides a *discretionary* exception to extradition, neither the magistrate's failure to deny extradition on the ground provided for in that article nor his decision not to make a determination as to whether Vo has been "proceeded against" before certifying him as extraditable deprives Vo of due process.

---

[12]Vo does not expressly state which portion of the Treaty he relies upon in making his due process arguments. Although his due process claims all relate to the extradition magistrate's failure to determine whether he "ha[d] been proceeded against," the key term in Article 5(2), at points he invokes Article 4, which allows extradition to be denied if the requested state "shall proceed against the person" for the offense for which extradition is sought. However, in his reply brief to this court, Vo makes clear that his due process claims involve only Article 5(2). He asserts in that brief that "the question under the Treaty here is not whether there *will be* a prosecution, but whether the person *has been* proceeded against." (emphasis in original).

*1. Vo's Due Process Rights Were Not Violated By the Magistrate's Failure to Deny Extradition on the Ground that He Has Been "Proceeded Against"*

**[8]** As discussed in the section explaining the extradition procedures, an extradition court exercises very limited authority in the overall process of extradition. Its role is limited to determining an individual's eligibility to be extradited, which it does by ascertaining whether a crime is extraditable under the relevant treaty and whether probable cause exists to sustain the charge. "If those requirements are met, the judicial officer *must* certify the individual as extraditable to the Secretary of State." *Prasoprat*, 421 F.3d at 1014 (emphasis in original) (citing *Blaxland*, 323 F.3d at 1208 ("If the evidence is sufficient to sustain the charge, the inquiring magistrate judge is required to certify the individual as extraditable to the Secretary of State . . . .")). In determining whether an individual is extraditable, the extradition magistrate examines the treaty to ascertain whether it allows extradition in the circumstances presented by the relator. Extradition treaties often provide for the general extraditability of individuals who commit offenses that are recognized as crimes in both the requesting and the requested states, subject to enumerated exceptions. These exceptions are of two general types: mandatory exceptions (including political offenses) and discretionary exceptions.[13] If an individual falls within a mandatory exception, the United

---

[13]The two types of exception are characterized by different language in extradition treaties. The use of "shall" language in a treaty indicates a provision constitutes a mandatory exception. For instance, Article 3(1)(a) of the Treaty provides, "[e]xtradition *shall not* be granted when: the offense for which extradition is sought is a political offense." The use of "may" language in a treaty indicates a provision constitutes a discretionary exception. Article 5(2) of the Treaty, for example, provides "[e]xtradition may be denied when the person sought is being or has been proceeded against in the Requested State for the offense for which extradition is requested." As the Letter of Submittal accompanying the Treaty noted, "Article[ ] 3 state[s] mandatory grounds for refusal of extradition. . . . Article[ ] . . . 5 state[s] discretionary grounds for refusal of extradition."

States cannot extradite him to the requesting country and the magistrate may not certify him as extraditable. If an individual falls within a discretionary exception, however, the United States can choose not to extradite him to the requesting country, but it is under no obligation to the relator to do so. When requested by the United States, the magistrate must certify an individual even though he may be subject to a discretionary exception.

**[9]** As a result of the varying consequences of the two types of exceptions and the limitations on an extradition court's authority, the only actions of an extradition court relating to exceptions that can ordinarily give rise to a due process claim are those that involve mandatory exceptions. Because an individual who falls within a mandatory exception cannot be extradited, an extradition court must determine whether that individual qualifies for such an exception. An extradition court's failure to do so would violate the individual's due process rights. By contrast, even if an individual's circumstances satisfy the criteria for a discretionary exception, he can still be extradited if the Secretary of State so decides. In other words, an extradition court is without authority to prevent an extradition on the basis of a discretionary exception and thus *cannot* deny extradition on that basis. *Blaxland*, 323 F.3d at 1208. Accordingly, Vo's claim that the extradition court violated his due process rights by not denying extradition on the ground that he had been "proceeded against" in the United States is without merit — only the Secretary of State can deny extradition on that ground.[14]

---

[14]There is also no merit to Vo's contention that unless courts make determinations pursuant to all exceptions in an extradition treaty — mandatory or discretionary — the Secretary of State would be able to extradite someone who had been acquitted in the United States of the offense for which extradition was sought. Unlike cases in which an individual is, has been, or will be "proceeded against" for the offense for which extradition is sought, which are covered by Articles 5(2) and 5(3) of the Treaty, cases in which an individual has been acquitted of such an offense are covered

*2.  Vo's Due Process Rights Were Not Violated By the Magistrate's Decision Not to Make a Determination Whether He Had Been "Proceeded Against"*

Vo also raises another due process claim: he asserts that the extradition magistrate deprived him of due process by not making a determination whether under the terms of the Treaty he had been "proceeded against." Vo asserts that the extradition court may do so, indeed must do so, in order to assist the Secretary of State in the exercise of her discretion. We reject this claim also.

[10] We have repeatedly held that an extradition court's decision not to consider evidence, or not to make findings relevant to a discretionary exception, does not violate due process. In *Lopez-Smith*, for instance, the petitioner sought a writ of habeas corpus on the ground that the extradition magistrate had violated the petitioner's due process rights by refusing to consider evidence regarding whether the Secretary ought to exercise the discretion provided by the terms of the extradition treaty not to extradite him to Mexico. We rejected this claim on the ground that extradition is "entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." *Lopez-Smith*, 121 F.3d at 1326. We stated that the statutorily imposed judicial functions encompass the entirety of a court's obligations in

_____

by Article 5(1). That provision of the Treaty states that "[e]xtradition *shall not be granted* when the person sought has been tried and convicted or acquitted in the Requested State for the offense for which extradition is requested." (Emphasis added). Article 5(1) therefore creates a mandatory exception to extradition that an extradition court must rule on as part of its eligibility determination. If an individual has in fact been acquitted of the offense for which extradition is sought but the extradition court declines to apply Article 5(1) and certifies him as eligible for extradition, that individual would undoubtedly have a valid due process claim as the extradition court's actions would involve a failure to rule on a *mandatory* exception, not, as here, a *discretionary* exception.

the extradition process, emphasizing that "[t]he magistrate judge has no discretionary decision to make." *Id*. Because discretionary decisions are within the province of the Secretary of State and not the extradition magistrate, we held that "it is . . . for the Secretary to decide what evidence might have a bearing upon" a discretionary decision. Thus, an extradition court's failure to consider evidence that might aid the Secretary does not deprive an individual of due process. *Id*. Similarly, in *Prasoprat*, we rejected a petitioner's claim that a magistrate judge deprived him of due process by denying a discovery motion seeking evidence related to a discretionary exception in the applicable extradition treaty because "the evidence that Prasoprat sought in his motion for discovery was not relevant to the extradition judge's limited inquiry." *Prasoprat*, 421 F.3d at 1015.

Here, as in *Lopez-Smith* and *Prasoprat*, Vo argues that the extradition court's failure to take action that would aid the Secretary of State in the exercise of her discretion violates his due process rights. Because Vo seeks a determination from the extradition court — a determination whether he had been "proceeded against" for purposes of Article 5(2) — only in order to aid the Secretary in her exercise of discretion under the Treaty and because an extradition court has no authority to provide such aid, at least in the absence of a request from the Secretary, the extradition court's failure to construe the treaty did not deprive Vo of due process.

We note that the ruling Vo seeks would neither affect his eligibility for extradition nor preclude the Secretary from exercising her discretion to extradite him. Only if, subsequent to the issuance of Vo's certification of eligibility, the Secretary concluded that she does not possess the discretion to refuse to extradite him under Article 5(2) of the Treaty would the question of law regarding the Secretary's authority that Vo asks us to answer become material. It would be premature, therefore, for us to consider on this appeal whether, if the Secretary determines that she does not have discretion under Arti-

cle 5(2) of the Treaty to refuse to extradite Vo because the legal steps taken to prosecute him do not fall within the meaning of "proceeded against" as used in the Treaty, the federal courts would have the authority to review that determination for legal error. We also do not consider here whether an extradition magistrate has the authority to answer such a question regarding the construction of a treaty if the Secretary herself requests that ruling.

[11] For the above reasons, the magistrate judge's failure to determine the meaning of the term "proceeded against" in the hearing he conducted did not violate Vo's due process rights.

## IV.  Conclusion

Vo has not satisfied the uprising prong of the incidence test, which governs the application of the political offense exception. Nor have his due process rights been violated. Accordingly, the judgment of the district court denying Vo's petition for habeas corpus is **AFFIRMED.**