In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2529

NERINGA VENCKIENE,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-CV-3061 — **Virginia M. Kendall**, *Judge.*

ARGUED NOVEMBER 27, 2018 — DECIDED JULY 15, 2019

Before BAUER, HAMILTON, and BARRETT, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Lithuania seeks extradition of petitioner Neringa Venckiene from the United States to prosecute her for several alleged offenses arising from a custody battle over Venckiene's niece. After a hearing pursuant to 18 U.S.C. § 3184, a magistrate judge certified Venckiene as extraditable and the Secretary of State granted the extradition. Venckiene moved the magistrate judge for a temporary stay of her extradition, which was granted. She then filed a petition

for a writ of habeas corpus in the district court challenging both the magistrate judge's certification order and the Secretary's decision. She also asked the district court to stay her extradition, but the district court denied that request.

In her habeas corpus petition, Venckiene claims the magistrate judge erred in two ways: failing to apply the political offense exception in the Lithuania-United States extradition treaty to her case, and finding probable cause that she was guilty of the offenses charged. Venckiene also claims that the Secretary of State's decision to grant the extradition violated her constitutional right to due process and failed to consider that Venckiene might be subject to what we have called "particularly atrocious procedures or punishments," see *In re Burt*, 737 F.2d 1477, 1487 (7th Cir. 1984), if she is returned to Lithuania.

This appeal challenges directly only the district judge's denial of Venckiene's request to extend the stay of her extradition, but that challenge necessarily implicates the merits of her habeas petition. We affirm the district court's denial of a stay. In Part I, we explain the extradition process, including the applicable treaty provisions and the limited scope of the judicial role. In Part II, we summarize what we know about events in Lithuania leading to this case. In Part III, we review the United States legal proceedings thus far. In Part IV, we analyze the legal issues presented, considering in Part IV-A Venckiene's challenges to the magistrate judge's order and in Part IV-B her challenges to the Secretary's decision, and finally in Parts IV-C and IV-D other factors relevant to Venckiene's stay request.

I.  *The Extradition Process*

A.  *The Lithuania-U.S. Extradition Treaty*

International extradition is first and foremost a creature of treaties. Under the extradition treaty between the United States and Lithuania, an offense is extraditable "if it is punishable under the laws in both States by deprivation of liberty for a period of more than one year or by a more severe penalty." Extradition Treaty, Lithuania-United States, art. II, § 1, March 31, 2003, T.I.A.S. No. 13166. The treaty makes an exception, however, "if the offense for which extradition is requested is a political offense," art. IV, § 1, a term not defined in the treaty. The treaty also specifies what the requesting party must provide to obtain extradition of a person accused of an extraditable offense:

> 3. A request for extradition of a person who is sought for prosecution also shall include:
>
> (a) a copy of the warrant or order of arrest issued by a judge, court, or other authority competent for this purpose;
>
> (b) a copy of the charging document; and
>
> (c) such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought.

Art. VIII, § 3.

B.  *The Judicial Role in Extradition*

The judicial branch plays a central but limited role in the extradition process, as laid out in statutes and case law. *See* 18 U.S.C. §§ 3184–3195; *Burgos Noeller v. Wojdylo*, 922 F.3d 797,

802 (7th Cir. 2019); *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981). The process begins when a foreign government makes a formal request to the United States government through diplomatic channels. That request is forwarded to the Department of Justice, which then ordinarily files a complaint and seeks an arrest warrant from a judge. *Burgos Noeller*, 922 F.3d at 802.

The person targeted by the request is entitled to a hearing before a judge pursuant to 18 U.S.C. § 3184. The scope of inquiry at this hearing is limited: "the 'judicial officer's inquiry is confined to the following: whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof.'" *Skaftouros v. United States*, 667 F.3d 144, 154–55 (2d Cir. 2011), quoting *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000). If the judge finds that these three conditions have been satisfied and the accused is extraditable, the judge *must* certify the extradition to the Secretary of State. The court has no discretion. See *Burgos Noeller*, 922 F.3d at 803; *Santos v. Thomas*, 830 F.3d 987, 992 (9th Cir. 2016) (en banc).

"The Secretary of State has 'sole discretion to determine whether or not extradition should proceed further with the issuance of a warrant of surrender.'" *Burgos Noeller*, 922 F.3d at 803, quoting *Eain*, 641 F.2d at 508; see 18 U.S.C. § 3186. In making this decision, the Secretary is authorized to consider factors that United States federal courts in extradition cases cannot take into account. The executive branch has sole authority to consider issues like the political motivations of a requesting country and whether humanitarian concerns justify

denying a request. See *Burgos Noeller*, 922 F.3d at 808; *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006).

Generally, the Secretary of State's extradition decision is not subject to judicial review. This circuit and others, however, have recognized an exception through which courts can, at least in theory, consider claims that "the substantive conduct of the United States in undertaking its decision to extradite … violates constitutional rights." *Burt*, 737 F.2d at 1484; see also *Martin v. Warden*, 993 F.2d 824, 829 (11th Cir. 1993) (recognizing that constitutional rights are superior to treaty obligations, but finding no violation of constitutional rights in long-delayed extradition request); *Plaster v. United States*, 720 F.2d 340, 349 (4th Cir. 1983) (recognizing constitutional claims but vacating grant of writ of habeas corpus). We said in *Burt*:

> Generally, so long as the United States has not breached a specific promise to an accused regarding his or her extradition and bases its extradition decisions on diplomatic considerations without regard to such constitutionally impermissible  factors as race, color, sex, national origin, religion, or political beliefs, and in accordance with such other exceptional constitutional limitations as may exist because of particularly atrocious procedures or punishments employed by the foreign jurisdiction, those decisions will not be disturbed.

737 F.2d at 1487 (internal citations omitted) (affirming denial of writ of habeas corpus).

Under the applicable statutes, the accused may not appeal directly a judge's order to certify her for extradition, but case

law has long recognized a limited form of appellate review through a petition for a writ of habeas corpus. See *Collins v. Miller*, 252 U.S. 364, 368–69 (1920); *Burgos Noeller*, 922 F.3d at 803; *Eain*, 641 F.2d at 508; *In re Assarsson*, 635 F.2d 1237, 1240–41 (7th Cir. 1980).

In such habeas corpus cases, however, courts generally may consider only "whether the magistrate had jurisdiction, whether the offence charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty," i.e., probable cause. *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1112 (7th Cir. 1997) (reversing writs of habeas corpus), quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). Under this probable cause standard, the judge must "determine whether there is competent evidence to justify holding the accused to await trial." *Sidali v. I.N.S.*, 107 F.3d 191, 199 (3d Cir. 1997), quoting *Peters v. Egnor*, 888 F.2d 713, 717 (10th Cir. 1989). It is not the magistrate's role, however, "to determine whether the evidence is sufficient to justify a conviction." *Id.* That is the job of the requesting country's courts.

II. *The Events in Lithuania*

In applying political offense exceptions to extradition treaties, factual details matter, so we review events in some detail. Neringa Venckiene worked as a judge in Lithuania from 1999 until 2012. Her brother was Drasius Kedys. Kedys had a daughter with his then-girlfriend Laimute Stankunaite. As of 2008, the couple had separated and Kedys had full custody of their daughter, Venckiene's niece. Sometime in 2008, when she was four years old, the girl told her grandmother that she was being sexually abused by three men. The men were

eventually identified as public officials: Andrius Usas, an assistant to the Speaker of the Lithuanian parliament, Jonas Furmanavicius, a Kaunas Regional Court Judge, and Vaidas Milinis, the President of the Kaunas Regional Court.

Law enforcement authorities were notified about the girl's claims, but according to Venckiene, "the case was purposefully delayed, investigations and complaints were ignored, and the case shifted hands for months." In response to these delays, Venckiene wrote a book about the pedophilia case and its stagnated investigation entitled *Drasius's Hope to Save the Girl*. Venckiene believes that what her niece experienced was part of a larger pedophilia network in Lithuania. She thinks that the Lithuanian network is related to a pedophilia scandal that took place in Latvia in 2000 and in which several high-ranking officials participated.

On October 5, 2009, Furmanavicius and Stankunaite's sister were murdered. Lithuanian authorities suspected Kedys of committing these crimes, but Kedys himself disappeared soon after that. His body was eventually discovered on the bank of a lagoon. The government declared his death accidental, caused by alcohol-induced asphyxiation, but Venckiene asserts that an independent criminologist found no alcohol in Kedys's system. Venckiene was awarded custody of his daughter, her niece, pending resolution of the pedophilia case. In June 2010, Usas was also found murdered.

Venckiene continued to criticize corruption in Lithuania. On November 17, 2010, in a conversation with journalists, she publicly condemned the Lithuanian court system for its corruption. She asserts that the chairman of the Lithuanian Judicial Council censured her for her comments and subjected her to ethical hearings based on a charge of insulting or

humiliating the court. She further asserts that a pretrial investigation into whether she had actually broken any laws through these comments was discontinued in January 2011 after the prosecutor found no evidence to suggest that she had broken the law. Venckiene says, however, that in February 2011, the head of the Judicial Council successfully petitioned to extend the statute of limitations on this charge of "humiliating the court." In 2012, these comments were cited to support revoking Venckiene's judicial immunity. According to Lithuania, at some point in 2010, Venckiene also conducted illegal surveillance on public individuals she suspected of pedophilia and Stankunaite.

On December 16, 2011, a court ordered Venckiene to return her niece to the custody of her niece's mother, Kedys's former girlfriend, Stankuanaite. The court ordered the transfer on two separate occasions. Both times the girl refused to go with her mother. On March 23, 2012, Stankunaite came to Venckiene's home with a bailiff and about 25 police officers to execute the court's order and take back her daughter. The attempt was unsuccessful, and the girl was traumatized by the incident. A video recording of the attempted seizure was posted to the internet and received national attention. The story alerted the public to the pedophilia incidents. Hundreds of people began camping out around Venckiene's home to help protect the girl.

On May 17, 2012, the police again attempted to remove the girl from Venckiene's home. The criminal charges against Venckiene relevant to this appeal are based on the events of that date. Venckiene describes the encounter as violent. She says that officers broke down her door and physically removed her niece from her lap before covering the girl's face

with a blanket soaked in psychotropic substances intended to subdue her. Venckiene reports that she and several protesters went to the hospital seeking treatment for injuries inflicted by the officers. The police officers who executed the custody transfer described Venckiene as aggressive and hysterical. They said that she refused to allow the officers to communicate with the girl and even punched one officer in the face.

After her niece was removed, Venckiene became more outspoken. She published another book, *Way of Courage*, which covered the pedophilia case and leveled criticisms against the Lithuanian judicial system, prosecution, and courts. On June 26, 2012, Venckiene's judicial immunity was revoked. She then resigned from her judicial position and became politically active. Her second book had inspired the creation of Way of Courage, a political party that organized protests, circulated petitions, and fostered dialogues on internet forums and blogs. Venckiene became the face of the party during its campaign for the October 2012 parliamentary election in Lithuania. Way of Courage won seven seats in the election; Venckiene was elected the party's chair. Venckiene's political tenure was short-lived. The prosecutor general petitioned the Lithuanian parliament to remove Venckiene's parliamentary immunity so that she could be arrested for charges related to the May 17th removal of her niece. Venckiene's parliamentary immunity was in fact removed on April 13, 2013.

At some point in 2012, Venckiene was notified that she was suspected of several criminal offenses. Venckiene refused to accept formal service of process and went into hiding. On April 8, 2013, Venckiene flew from Germany to the United States. She applied for asylum immediately and has since been living and working in Illinois.

III. *Legal Proceedings in the United States*

About five years after Venckiene fled to the United States, Lithuania formally requested her extradition under the treaty. The United States government filed a complaint in the Northern District of Illinois and obtained a warrant for Venckiene's arrest. She was arrested on February 13, 2018. The complaint charged Venckiene with the following offenses:

1. Complicity in committing a criminal act (unlawful collection of information about a person's private life, i.e., stalking), in violation of Lithuania Criminal Code Article 25;

2. Unlawful collection of information about a person's private life, i.e., stalking, in violation of Lithuania Criminal Code Article 167;

3. Hindering the activities of a bailiff, in violation of Lithuania Criminal Code Article 231;

4. Failure to comply with a court's decision not associated with a penalty, in violation of Lithuanian Criminal Code Article 245;

5. Causing physical pain, in violation of Lithuania Criminal Code 140(1); and

6. Resistance against a civil servant or a person performing the functions of public administration, in violation of Lithuania Criminal Code Article 286.

Magistrate Judge Daniel Martin held an extradition hearing pursuant to 18 U.S.C. § 3184 and certified Venckiene as extraditable for offenses three through six. The judge found no probable cause to support the first two charges. Venckiene

was committed to the custody of the U.S. Marshal pending the Secretary of State's decision on her extradition and surrender.

On February 23, 2018, the same day Judge Martin certified Venckiene for extradition, the government sent Venckiene's attorney a letter saying that Venckiene could seek review of the magistrate judge's order through a petition for a writ of habeas corpus. The letter noted that if a habeas petition were filed, Venckiene would not need to file a motion to stay the Secretary of State's review of her case. The Secretary's review, the letter explained, would be suspended automatically upon the filing of the petition. His review would resume only if and after the district court denied the petition. Absent such a habeas filing, the letter continued, the Secretary would proceed and render a decision.

The court sent the extradition documents to the Secretary of State three days later, on February 26, 2018. On the same day, Venckiene filed a motion to stay certification of her extradition proceedings pending the resolution of the habeas corpus petition that she intended to file. The government objected on the ground that a stay was unnecessary. The government argued that the Secretary of State would not issue a warrant of surrender until at least 30 days after the entry of the extradition certification order, which meant that Venckiene had 30 days to file a habeas petition, thereby automatically suspending the Secretary's review. The magistrate judge denied Venckiene's motion to stay.

Venckiene submitted additional materials to the Secretary of State, but she did not file a petition for a writ of habeas corpus. On April 20, 2018, the Secretary of State decided to surrender Venckiene for extradition. The Secretary did not provide specific reasons for his choice. His letter to Venckiene's

counsel said that he had conducted "a review of all pertinent information, including pleadings and filings submitted on behalf of Ms. Venckiene."

Two days later, on April 25, 2018, Venckiene filed another motion asking the magistrate judge to stay certification of her extradition or to set an additional hearing. The government opposed the motion. Venckiene filed a petition for a writ of habeas corpus in the district court on April 30, 2018. Her petition challenges both the magistrate judge's order certifying her extradition and the Secretary of State's decision to allow her extradition to proceed. On May 1, 2018, the magistrate judge granted a temporary stay of Venckiene's extradition through May 10, 2018. On May 7, 2018, Venckiene filed a separate stay motion that asked the district court to extend the stay granted by the magistrate judge. The district court determined that Venckiene was not likely to succeed on the merits of her habeas petition and that none of the remaining stay factors supported her position. The district court therefore denied the motion to extend the stay. *Venckiene v. United States*, 328 F. Supp. 3d 845, 869 (N.D. Ill. 2018).

IV. *Legal Analysis*

In deciding whether to stay a federal court decision (other than a money judgment) while review proceeds, on appeal or otherwise, courts consider the merits of the moving party's case, whether the moving party will suffer irreparable harm without a stay, whether a stay will injure other parties interested in the proceeding, and the public interest. See *Nken v. Holder*, 556 U.S. 418, 428 (2009); *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  The standard calls for equitable balancing, much like that required in deciding whether to grant a preliminary injunction or a temporary restraining order. See

*Hilton*, 481 U.S. at 777–78 (explaining that stronger showings on some factors can offset weaker showings on others).

We review the district court's denial of the stay for an abuse of discretion. See *Nken*, 556 U.S. 418, 433 (2009); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) (affirming denial of preliminary injunction). We review findings of fact for clear error. See *Vo v. Benov*, 447 F.3d 1235, 1240 (9th Cir. 2006) ("Mixed questions are reviewed de novo, though . . . if the determination is essentially factual . . . it is reviewed under the clearly erroneous standard.") (internal citation and quotation omitted). Also, as a general rule, if a district court bases an exercise of discretion on a legal error, it turns out to abuse its discretion. E.g., *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057 (7th Cir. 2016), quoting *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012); see also *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.").

We focus first on whether Venckiene is likely to prevail on the merits of her habeas corpus petition, which challenges the magistrate judge's certification order on two grounds and the Secretary of State's extradition decision on two grounds. Venckiene argues that the magistrate judge erred because she is entitled to protection under the political offense exception to the Lithuania-United States extradition treaty, and because Lithuania failed to demonstrate probable cause that she committed the crimes for which extradition is sought. Venckiene contends that the Secretary of State's decision to surrender her to Lithuania was in error because it failed to consider adequately the evidence she produced indicating that she would

be subject to "atrocious procedures and punishments" if re-
turned, and because the process through which the decision
was made violated her right to due process. Venckiene also
argues that the courts should stay her extradition based on
proposed legislation pending in Congress. After addressing
the merits, we consider the remaining stay factors. We agree
with the district court that Venckiene is not likely to prevail
on the merits of her challenges, and the other factors also
weigh against granting a stay.

A. *Challenges to the Magistrate Judge's Certification Order*

As noted above, there is no specific statutory mechanism
for appellate review of a magistrate judge's decision to certify
extradition under 18 U.S.C. § 3184, but federal courts have
long endorsed the use of a petition for a writ of habeas corpus
to obtain such review. Typically, habeas corpus petitions chal-
lenging a magistrate judge's certification order are filed be-
fore the Secretary of State renders an extradition decision, and
the Secretary typically waits to make a decision until the ha-
beas process has run its course. Here the sequence was re-
versed, but we are not aware of a statute or precedent barring
consideration of a habeas corpus petition filed after the Secre-
tary of State's decision. See *Venckiene v. United States*, 328 F.
Supp. 3d 845, 863 (N.D. Ill. 2018). At a minimum, the habeas
court may consider the findings under § 3184 that must be
made to give the Secretary the power to order extradition.

1. *Likelihood of Success on the Merits—Political Offense
   Exception*

Lithuania's extradition treaty with the United States pro-
vides that extradition "shall not be granted if the offense for
which extradition is requested is a political offense."

Extradition Treaty, Lithuania-U.S., art. IV, § 1, March 31, 2003, T.I.A.S. No. 13166. This so-called "political offense exception" is common in extradition treaties and is not defined in this treaty. United States federal courts interpreting extradition treaties have typically recognized two types of political offenses: "pure" political offenses and "relative" political offenses.

Pure political offenses are crimes like treason, sedition, and espionage, acts "directed against the state but which contain[] none of the elements of ordinary crime." *Eain v. Wilkes*, 641 F.2d 504, 512 (7th Cir. 1981). "A 'relative' political offense is one in which a common crime is so connected with a political act that the entire offense is regarded as political." *Id.*, quoting Garcia-Mora, *The Nature of Political Offenses: A Knotty Problem of Extradition Law*, 48 Virginia L. Rev. 1226, 1230–31 (1962). Venckiene argues that the charges she faces amount to relative political offenses. Whether an offense qualifies as political under this exception is reviewable on habeas corpus as part of the question of whether the offense charged is within the terms of the governing extradition treaty. *Vo*, 447 F.3d at 1240. It is a mixed question of law and fact. *Id.*

This treaty, like others, leaves courts with the task of identifying political offenses, and especially "relative" political offenses. See *Quinn v. Robinson*, 783 F.2d 776, 793–805 (9th Cir. 1986) (overview of relative political offenses). Federal courts have adopted a two-pronged test for identifying qualifying relative political offenses. "Known as 'the incidence test,' it asks whether (1) there was a violent political disturbance or uprising in the requesting country at the time of the alleged offense, and if so, (2) whether the alleged offense was incidental to or in the furtherance of the uprising." *Ordinola v.*

*Hackman*, 478 F.3d 588, 597 (4th Cir. 2007); see *Eain*, 641 F. 2d at 518 ("limit[ing] such offenses to acts committed in the course of and incidental to a violent political disturbance such as a war, revolution or rebellion"). The second prong of this test uses both subjective and objective inquiries. Courts must evaluate the intentions and motives of the accused as well as the objectively political nature of the acts underlying the charged offense conduct. See *Ordinola*, 478 F.3d at 600.

We have noted before that the judiciary's role in the political offense exception is an "anomaly in the American law of extradition." *Eain*, 641 F.2d at 513. Under the settled and general rule of non-inquiry, "[i]n extradition, discretionary judgments and matters of political and humanitarian judgment are left to the executive branch." *Burgos Noeller*, 922 F.3d at 802; see *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006). The rule of non-inquiry is critical to the continued operation of bilateral extradition treaties between the United States and foreign governments. The rule "prevent[s] extradition courts from engaging in improper judgments about other countries' law enforcement and judicial procedures" and "'serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request.'" *Burgos Noeller*, 922 F.3d at 808, quoting *Hoxha*, 465 F.3d at 563.

Despite the general rule of non-inquiry, treaties and 18 U.S.C. § 3184 effectively require courts to consider at least some political issues related to extradition. Whether the requesting country has charged the accused with a crime covered by the treaty is a legal issue for the courts to decide. When a treaty has an exception for political offenses, courts can and sometimes must decide whether the charged crime is

so political in nature as to apply the exception. We recognize that there is a political dimension to the charges against Venckiene, at least in the colloquial sense. As the concept of a relative political offense has been defined over many decades of case law, however, the charges against her do not qualify as relative political offenses.

A "violent political disturbance or uprising" is a prerequisite to finding a relative political offense. See *Koskotas v. Roche*, 931 F.2d 169, 171 (1st Cir. 1991); *Ordinola*, 478 F.3d at 596–97; *Vo*, 447 F.3d at 1240–41; *Meza v. United States Attorney General*, 693 F.3d 1350, 1359 (11th Cir. 2012); *In re Manea*, 2018 WL 1110252, at *25 (D. Conn. March 1, 2018). To prove this element of the incidence test, Venckiene relies on her and others' resistance to the political and judicial corruption that arose out of her niece's allegations of sexual abuse. This resistance, she contends, evolved into protests, petitions, and publications that culminated in the formation and political success of the Way of Courage political party. Venckiene notes that the resistance resulted in the deaths of four people under suspicious circumstances—three connected to the pedophilia allegations, plus her brother Kedys. Venckiene also points out that she and her family sustained injuries during the assault on her home that led to her niece's removal.

The information Venckiene has provided does not establish a "violent political disturbance or uprising." We have described sufficient resistance events as "war, revolution or rebellion." *Eain*, 641 F. 2d at 518. Although these are not the only acts that satisfy the first prong of the incidence test, they provide guideposts for assessing whether other claimed disturbances or uprisings fall within the general range of qualifying political events. Venckiene's and Way of Courage's actions are

exercises in democratic freedom. Protesting and petitioning a corrupt government are certainly political acts, but they are not comparable to war, revolution, or rebellion. It is unclear whether the deaths Venckiene points to were in fact incidents of political violence. Little to nothing in the record describes the circumstances of the deaths of the three people tied to the pedophilia allegations, and the cause of Kedys's death is in dispute. As for the assault on Venckiene's home, although this event resulted in minor injuries, it was an isolated incident focused on issues of custody under family law. Venckiene's resistance to a court order awarding custody of a child to her mother, her efforts to fight corruption, and the Way of Courage's win of seven seats in the Lithuanian legislature cannot be described as a "violent struggle for control of the country." *Ordinola*, 478 F.3d at 599.

The types of events that other circuits have determined to qualify as "violent political disturbance[s] or uprising[s]" are not comparable to what Venckiene describes. For example, in *Ordinola v. Hackman*, the Fourth Circuit considered the conflict between the Peruvian government and the Shining Path, "a 'highly organized guerrilla organization with a Maoist communist ideology dedicated to the violent overthrow of Peru's democratic government and social structure.'" 478 F.3d at 591, quoting *Sotelo-Aquije v. Slattery*, 17 F.3d 33, 35 (2d Cir. 1994). The conflict had placed about "50 percent of Peruvian territory and approximately 65 percent of the country's population…under a state of national emergency." *Ordinola*, 478 F.3d at 599 (internal citation and quotation omitted). The court had little trouble describing this situation "as a 'political revolt, an insurrection, or a civil war.'" *Id.*, quoting *Ornelas v. Ruiz*, 161 U.S. 502, 511 (1896). Similarly, in *Barapind v. Enomoto*, the Ninth Circuit had "no real doubt that the crimes Barapind

[was] accused of committing occurred during a time of violent political disturbance in India" where there had been "[t]ens of thousands of deaths and casualties . . . as Sikh nationalists clashed with government officers and sympathizers in Punjab." 400 F.3d 744, 750 (9th Cir. 2005) (internal citation omitted) (alteration in original). "Substantial violence was taking place, and the persons engaged in the violence were pursuing specific political objectives." *Id.*

Even if we were convinced that Venckiene had shown the existence of a "violent political disturbance or uprising," the political offense exception still would not apply because she has not shown that the charged offenses were "incidental to or in furtherance of the uprising." The magistrate judge based his certification of Venckiene's extradition on four charged offenses, all of which stem from the events of May 17, 2012, when officers removed Venckiene's niece from her home by force. Venckiene is charged with disobeying a court's orders to transfer custody of her niece, hindering law enforcement's efforts to transfer custody, hitting her niece's mother to whom custody was being transferred, and hitting one of the officers effecting the transfer. The political offense exception requires "a direct link between the perpetrator [of the offenses], a political organization's political goals, and the specific act[s]." *Eain*, 641 F.2d at 521. Courts must look at both the subjective and objective nature of the alleged offenses, "although the objective view must usually carry more weight." *Ordinola*, 478 F.3d at 600. We cannot conclude that the charged offenses were objectively political within the meaning of the political offense exception.

We accept Venckiene's assertions that her actions leading to the charges were motivated at least in part by political

goals**.** But from an objective viewpoint, we do not think the charged offenses can be deemed political. "[A] political motivation does not turn every illegal action into a political offense." *Id.*; see *Escobedo v. United States*, 623 F.2d 1098, 1104 (5th Cir. 1980) ("An offense is not of a political character simply because it was politically motivated"). For decades federal courts have applied the incidence test, usually resulting in decisions finding that the political offense exception did not apply. *Eain*, 641 F.2d at 518; see also *id.* at 520–23 ("The definition of 'political disturbance,' with its focus on organized forms of aggression such as war, rebellion and revolution, is aimed at acts that disrupt the political structure of a State[,]" political offense exception did not apply under incidence test where petitioner's bombing was not incidental to political upheaval in Israel at time); *Sindona v. Grant*, 619 F.2d 167, 173 (2d Cir. 1980) (fraudulent bankruptcy is not subject to exception even where "it resulted from political maneuverings and [was] pursued for political reasons"); *Escobedo*, 623 F.2d at 1101, 1104 (under incidence test, petitioner's offenses—attempting to kidnap the Cuban Consul in Mexico and killing another man in the process—did not qualify him for political offense exception: "An offense is not of a political character simply because it was politically motivated"); *Koskotas*, 931 F.2d at 172 (political offense exception did not apply where petitioner "characterize[es] as a violent uprising what plainly is an electoral conflict tainted by allegations of political corruption"); *Ordinola*, 478 F.3d at 599 (political offense exception did not apply where offenses "occurred during the course of a violent political uprising" but "were not in furtherance of quelling the uprising").

To avoid a slippery slope, United States courts have confined the exception for relative political offenses to

exceptional circumstances qualitatively different from the facts here. The political offense exception in the extradition treaty with Lithuania "cannot be read to protect every act . . . simply because the suspect can proffer a political rationale for the action." *Ordinola*, 478 F.3d at 600.

The narrow scope of relative political offenses is also evident from *Ornelas v. Ruiz*, in which the Supreme Court considered Mexico's extradition request for Inez Ruiz, a member of a band of armed men who attacked, captured, and killed Mexican soldiers and civilians. 161 U.S. at 510. A commissioner reviewed the case and certified Ruiz for extradition. The district court hearing the case on habeas review reversed, concluding that Ruiz's acts fit the political offense exception in the Mexico-U.S. extradition treaty. *Id.* at 504, 506, 510. The Supreme Court reversed, framing its review narrowly as whether "the commissioner had no choice, on the evidence, but to hold, in view of the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed" that Ruiz's offenses were political. *Id.* at 511. The Fourth Circuit has explained that the Supreme Court's analysis in *Ruiz* suggests that, "To determine whether a particular offense is political under the Treaty, we must look to the totality of the circumstances, focusing on such particulars as the mode of the attack and the identity of the victims," and that a reviewing habeas court should overturn a judicial officer's determination that the political offense exception does not apply only when the offense in question is obviously objectively political. *Ordinola*, 478 F.3d at 601.

The totality of the circumstances does not help Venckiene. Most immediately, her alleged actions that led to the charges were efforts to stop law enforcement from removing her niece

from her custody pursuant to a court order. The injuries she allegedly inflicted were on a police officer executing his orders to remove the child and on the child's mother to whom custody was being transferred. Venckiene's actions that day were not objectively those of someone furthering a political agenda. These charged offenses describe actions that were personal, not political. Venckiene has failed to demonstrate that she is likely to succeed in showing that the charges against her are subject to the political offense exception in the extradition treaty.

2.   *Likelihood of Success on the Merits—Probable Cause*

The magistrate judge certified Venckiene's extradition based on four of the six Lithuanian charges: hindering the activities of a bailiff; failing to comply with a court's decision not associated with a penalty; causing physical pain; and resisting against a civil servant or a person performing the functions of public administration. A reviewing court on habeas would evaluate the magistrate judge's probable cause decisions under a deferential standard. The issue would be only "whether there [was] any competent evidence to support [his] finding." *Burgos Noeller*, 922 F.3d at 807, quoting *Bovio v. United States*, 989 F.2d 255, 258 (7th Cir. 1993) (alteration in original).  Based on the evidence Lithuania provided to support its extradition request, it would be difficult to find that the magistrate judge erred in finding probable cause for these four offenses.

Lithuania submitted statements of multiple witnesses describing Venckiene's alleged offenses. The bailiff who attempted to carry out the court's custody transfer order explained that when officers arrived at Venckiene's house, she had erected obstacles around her home. She refused to

remove them when the officers announced their presence. The bailiff further reported that once the officers entered the home, Venckiene refused to allow them to communicate with her niece. The statement said Venckiene was shouting and clutching her niece while kicking the girl's mother. The bailiff said that officers restrained Venckiene and gave the girl to her mother, who carried her out of the room. When Venckiene was released, the bailiff said, she punched a police officer twice. An Officer Gasauskas provided a statement saying that Venckiene punched him twice on the right side of his face. Another officer submitted a statement describing the punches he had observed. Lithuania also provided a summary of medical records describing Officer Gasauskas's injuries. Based on these submissions, the magistrate judge had competent evidence to find probable cause that Venckiene committed these four crimes for which extradition has been approved.

Venckiene argues that she presented evidence sufficient to refute the charges against her and thus to defeat probable cause. She asserts that a videotape of the May 17th incident does not show her punching a police officer. She also provided the district court with a translated transcript of the video. Her evidence, however, does not defeat the showing of probable cause, either as a matter of law or a matter of fact.

The law has long been clear that an extradition hearing "is not a trial." *Charlton v. Kelly*, 229 U.S. 447, 461 (1913). The requesting country is not required to try its case in a United States court. Also, extradition proceedings are not governed by the Federal Rules of Evidence or Criminal Procedure. See Fed. R. Evid. 1101(d)(3); Fed. R. Crim. P. 1(a)(5)(A). In extradition cases, courts have long tried to police a fuzzy boundary between explanatory evidence, which is permitted, and

contradictory evidence, which is beside the point. See *Burgos Noeller*, 922 F.3d at 807. "An accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof." *Eain*, 641 F.2d at 511; see *Charlton*, 229 U.S. at 461 ("To have witnesses produced to contradict the testimony for the prosecution is obviously a very different thing from hearing witnesses for the purpose of explaining matters referred to by the witnesses for the government"); *Collins v. Loisel*, 259 U.S. 309, 316–17 (1922) (reaffirming distinction drawn in *Charlton*). Federal courts have reframed this distinction as between prohibited contradictory evidence and admissible explanatory evidence. Explanatory evidence "explains away or completely obliterates probable cause." *Santos v. Thomas*, 830 F.3d 987, 992 (9th Cir. 2016) (en banc), quoting *Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999), superseded by statute on other grounds, Pub. L. No. 105-277, § 2242.

As a matter of fact, the video and transcript Venckiene provided do not explain away or obliterate probable cause. As the district court noted, the video and transcript end before Venckiene is alleged to have punched the officer. Even if the video had ended later and did not depict Venckiene punching a police officer, it still would not refute probable cause as to the other three charges. The video does not show that she did not "hinder the activities of a bailiff" or "fail[] to comply with a court's decision." Quite the opposite, the video and transcript provide substantial support for the charges that Venckiene attempted to prevent law enforcement from entering her home and seizing her niece to execute the court order. Thus, Venckiene also failed to show she is likely to succeed on this challenge to the magistrate judge's certification order.

B.  *Challenges to The Secretary of State's Certification Order*

The most unusual feature of this case is Venckiene's challenge to the decision of the Secretary of State. She argues that the Secretary's order violated her constitutional rights in two respects: that she will face "atrocious procedures and punishments" in Lithuania, and that she had a due process right to a hearing before the Secretary and to a meaningful explanation of his reasons for denying her the relief she sought.

Venckiene bases her "atrocious procedures" claim on language in *In re Burt*, 737 F.2d 1477, 1487 (7th Cir. 1984). As noted, we wrote in *Burt* that habeas corpus review of extraditions could, at least in theory, consider the Secretary of State's extradition decisions for the limited purpose of assessing whether these decisions violated constitutional rights. More specifically, courts may evaluate whether the executive's decisions were properly made "without regard to such constitutionally impermissible factors as race, color, sex, national origin, religion, or political beliefs, and in accordance with such other exceptional constitutional limitations as may exist because of particularly atrocious procedures or punishments employed by the foreign jurisdiction." *Id.* In *Burt* itself, however, we did not find any such constitutional violations. Nor have we found such constitutional violations in other extradition cases. While *Burt* and decisions in other circuits have recognized the possibility of such claims, we have not found other appellate decisions actually granting relief from extradition on such a theory.

*Burt* thus authorizes some limited review of the executive branch's extradition decision to ensure that the Secretary of State did not overlook the constitutionally inhumane conditions a petitioner may be subjected to if returned to a

requesting nation. However, these constitutional and humanitarian exceptions are in some tension with the established rule of non-inquiry and the Supreme Court's more recent guidance in a similar context in *Munaf v. Geren*, 553 U.S. 674 (2008).[1]

In extradition hearings, to decide whether to certify an accused for extradition, the rule of non-inquiry bars courts "from investigating the fairness of a requesting nation's justice system, and from inquiring into the procedures or treatment which await [the] surrendered fugitive in the requesting country." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) (internal citations and quotations omitted). After judicial certification of an extradition, the executive branch "exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations." *Sidali v. I.N.S.*, 107 F.3d 191, 195 n. 7 (3d Cir. 1997). Applying the rule of non-inquiry and *Burt*'s "atrocious procedures and punishments" exceptions simultaneously would seem to produce the peculiar result of barring federal courts from considering humanitarian issues *before* the Secretary of State makes the decision to extradite but allowing courts to consider the same concerns *after* the executive branch has weighed in, despite the absence of any recognized procedural

---

[1] Also, it is not clear that at least the national origin and political beliefs of the subject of an extradition request are irrelevant, let alone unconstitutional, considerations. Nationality is often relevant under extradition treaties (with different standards and procedures for nationals of the requesting nation as opposed to other persons). The subject's political beliefs might also be deemed relevant to the political and foreign policy considerations. Imagine the possible differences in the United States government's responses to requests to extradite a member of Shining Path in Peru vs. a Chinese dissident.

channel for judicial review of the Secretary's decision, which may involve delicate and difficult political and foreign policy choices.

The Supreme Court's decision in *Munaf v. Geren*, 553 U.S. 674 (2008), casts further doubt on the continued validity or at least the scope of *Burt*'s constitutional and humanitarian exceptions. In *Munaf*, the Court considered the habeas corpus petitions of two U.S. citizens challenging their detention by the Multinational Force-Iraq, the international coalition force operating in Iraq. Both men were accused of committing crimes in Iraq. *Id*. at 679. The Court held that United States courts had jurisdiction over these habeas corpus petitions but that courts could not exercise their jurisdiction to enjoin the Multinational Force-Iraq from transferring the petitioners to Iraqi custody or from allowing the petitioners to be tried in Iraqi courts. *Id.* at 690–92. Citing *Neely v. Henkel*, 180 U.S. 109 (1901), the Court concluded: "it is for the political branches, not the Judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments." *Id.* at 700–01.

One of the petitioners argued that the Court should prevent his transfer because his "transfer to Iraqi custody is likely to result in torture." 553 U.S. at 700. The Court rejected this argument: "Such allegations are of course a matter of serious concern, but in the present context that concern is to be addressed by the political branches, not the judiciary." *Id.* "The Executive Branch" the Court continued, "may, of course, decline to surrender a detainee for many reasons, including humanitarian ones." *Id.* at 702. But: "The Judiciary is not suited to second-guess such determinations—determinations that would require federal courts to pass judgment on foreign

justice systems and undermine the Government's ability to speak with one voice in this area." *Id.*

Although *Munaf* did not deal with extradition directly, it certainly offers guidance to courts in carrying out their limited role in the extradition context, teaching that the judiciary should refrain from encroaching upon the executive's political and humanitarian decisions regarding foreign justice systems.

This case does not require us to decide the outer boundaries for the executive branch's judgment regarding Venckiene's extradition. Assuming that the district court can review the Secretary of State's decision at all as part of the habeas case, Venckiene has not provided sufficient evidence that she could likely succeed. Given the above concerns regarding *Burt*'s constitutional and humanitarian exceptions, we emphasize that courts at least need to give wide latitude to the political and foreign policy dimensions of the executive's extradition decisions. Whatever the scope of the constitutional exception recognized in theory in *Burt*, the exception is not an invitation to federal courts to impose the United States Constitution on foreign jurisdictions.

*Burt*'s list of reviewable claims does not encompass Venckiene's claim that the Secretary of State's decision-making process violated her right to due process of law. Like the district court, however, we are persuaded by Fourth and Fifth Circuit cases supporting the position that a challenge like Venckiene's is reviewable, at least in principle. In *Peroff v. Hylton*, 563 F.2d 1099 (4th Cir. 1977), and *Escobedo v. United States*, 623 F.2d 1098 (5th Cir. 1980), the Fourth and Fifth Circuits considered habeas corpus petitions raising due process challenges to the Secretary of State's extradition decisions. In

*Peroff*, the Fourth Circuit agreed to consider the petition of an accused arguing that he was denied due process by the Secretary of State's refusal to conduct a hearing prior to issuing his warrant of extradition. 563 F.2d at 1102. In *Escobedo*, the Fifth Circuit heard a petitioner's argument that the discretion given to the executive branch under the relevant treaty violated due process because "no standards are provided to guide the exercise of this discretion." 623 F.2d at 1104–05. The court ultimately rejected the due process challenge on the merits. *Id.* at 1106.

Both cases indicate that a federal court exercising its habeas corpus power can at least consider a petitioner's argument challenging the executive branch's extradition process on due process grounds. The government has provided no case in which a court declined to hear this type of extradition due process challenge. Given this lack of contrary authority, we are not inclined to say that a Secretary of State's extradition decision is *never* reviewable on due process grounds, let alone grounds of racial or religious bias, for example.Although the circumstances in which federal courts could and should overturn the highly discretionary decision of the Secretary of State should be rare, we need not say here that judicial review is never available. The courts have a duty to protect people and our fundamental principles of justice in the unlikely event that the executive makes an extradition decision based blatantly on impermissible characteristics like race, gender, or religion. We therefore consider Venckiene's due process challenge in this appeal, reviewing the Secretary of State's extradition decision to determine the likelihood that Venckiene's due process claim would succeed on habeas corpus review.

1. *Likelihood of Success on the Merits—"Atrocious Proce-dures and Punishments"*

Venckiene offers three reasons why she believes she will be subjected to particularly atrocious procedures or punishments if returned to Lithuania. First, she points to the fact that Lithuania retroactively extended the statute of limitations for a charge of "humiliating the court" so that she could be tried for this offense despite the old limitations period having lapsed. This argument cannot succeed. In *Neely v. Henkel*, the Supreme Court specifically held that claims related to the *ex post facto* clause of the Constitution cannot serve as a basis to prevent extradition. 180 U.S. 109, 122 (1901) ("provisions of the Federal Constitution relating to the writ of *habeas corpus*, bills of attainder, *ex post facto* laws, trial by jury for crimes, and generally to the fundamental guaranties [sic] of life, liberty, and property embodied in that instrument…those provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country").

The same logic also defeats Venckiene's second argument regarding the *ex post facto* revocation of her judicial and parliamentary immunities. Such differences between our nation and a requesting nation's justice systems are not reasons that legally bar extradition and are not reasons for the judiciary to question the foreign policy judgment of the executive branch.

Venckiene's third argument is that if she is returned to Lithuania she will face deplorable conditions in the country's jails and prisons. In support, she provided numerous articles and decisions of courts in other nations that declined to extradite people to Lithuania because of the conditions of detention. E.g., Edwina Brincat, *Court turns down Lithuanian request to extradite Maltese man*, Times of Malta, May 18, 2017,

https://timesofmalta.com/articles/view/court-turns-down-lithuanian-request-to-extradite-maltese-man.648339; *Lithuanian extradition request turned down by High Court*, RTÉ, April 15, 2013, https://www.rte.ie/news/2013/0415/381541-lithuanian-extradition-request-turned-down/; *Savenkovas v. Lithuania*, Application No. 871/02 (European Court of Human Rights 2009) http://en.efhr.eu/2010/02/11/case-savenkovas-v-lithuania-application-no-87102-2009/; *Abu Zubaydah v. Lithuania*, Application No. 46454/11 (European Court of Human Rights 2018), https://www.refworld.org/cases,ECHR,5b0fde3e4.html. She also cited the U.S. State Department's Country Reports on Human Rights Practices in Lithuania. The 2018 report notes that "Some prison and detention center conditions [in Lithuania] did not meet international standards." *Lithuania 2018 Human Rights Report*, Bureau of Democracy, Human Rights, and Labor, United States Dept. of State, at 2 (2018), https://www.state.gov/wp-content/uploads/2019/03/LITHUANIA-2018-HUMAN-RIGHTS-REPORT.pdf. The 2017 Report came to same conclusion. *Lithuania 2017 Human Rights Report*, Bureau of Democracy, Human Rights, and Labor, United States Department of State, at 2 (2017), https://www.state.gov/wp-content/uploads/2019/01/Lithuania.pdf. The reports refer to complaints of confined spaces, improper hygiene, poor food, and substandard sanitary condition among others. *Id.*

Although Venckiene's suggestions are troubling, as were the concerns raised in *Munaf v. Green* about dangers to the petitioners if they were remanded to Iraqi custody, they do not persuade us that Venckiene would be likely to succeed on her habeas corpus claim asserting a risk of particularly atrocious procedures and punishments if extradition goes forward. To an extent, *Burt*'s "atrocious procedures" exception asks

American courts to evaluate foreign nations' criminal justice systems based on United States constitutional standards. As explained, this exception is therefore in tension with the Supreme Court's guidance in *Munaf v. Geren*, instructing that "it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments." 553 U.S. at 700–01.

In this case, we do not need to decide definitively whether *Munaf* voided the "atrocious procedures" exception in *Burt*. Venckiene has not provided us with the type of specific and detailed evidence that a court would need to be able to assess whether Lithuanian prison conditions generally constitute "atrocious punishment." We say this as members of a judicial system that often encounters credible, specific, and detailed claims that particular jails, prisons, and immigrant detention centers in the United States fail to meet United States constitutional or international standards. Without much more specific evidence of atrocious conditions that Venckiene is likely to experience if she is extradited, we are confident that blocking this extradition on such grounds, after the executive has already approved it, would go beyond the scope of our role in the extradition process.

### 2.  *Likelihood of Success on the Merits—Due Process*

Although the Fourth and Fifth Circuit cases, *Peroff* and *Escobedo*, found that federal courts may consider due process challenges to the executive's extradition decision, they also held that the level of process due was minimal. In *Peroff,* the Fourth Circuit explained that Peroff had no right to a hearing before the Secretary of State: "A person facing interstate extradition has no constitutional right to notice or a hearing before the governor who acts upon the extradition request.

*Marbles v. Creecy*, 215 U.S. 63 (1909). The need for flexibility in the exercise of Executive discretion is heightened in international extradition proceedings which necessarily implicate the foreign policy interests of the United States." 563 F.2d at 1102. The court continued:

> In enacting legislation pertaining to international extradition and in approving the extradition treaty now in effect between The United States and Sweden, Congress has not sought to prescribe the procedures by which the Executive's discretionary determination to extradite should be exercised. It would be manifestly improper for this Court to do so.

*Id.* at 1102–03. In *Escobedo*, the Fifth Circuit rejected petitioner's due process challenge to the executive's extradition discretion, emphasizing similarly that it was not the judiciary's role "to prescribe the procedures by which the Executive exercises its discretion[.]" 623 F.2d at 1106.

We agree with this reasoning. As the Fifth Circuit explained in *Escobedo*, United States citizens and others present in the United States may not be "whisked away to a foreign country for trial by Executive whim." 623 F.2d at 1105. An extradition case does not reach the Secretary of State unless a United States judicial officer finds under 18 U.S.C. § 3184 that the person is properly and legally extraditable under the standards of the applicable treaty. Those legal questions are for the courts, and the accused has ample procedural protections in the decision-making on those questions.

The same cannot be said about the foreign policy and humanitarian judgments left to the executive branch. As noted,

the Secretary of State exercises broad discretion in extradition decisions. The judiciary has no authority to impose requirements on this decision-making process that go beyond the scope of what is required under the Constitution. Based on these decisions and the fact that Venckiene can cite no case in which a court found a right to a hearing, let alone a due process violation, in the executive portion of the extradition process, Venckiene is not likely to be successful on the merits of her due process argument.

C. *Pending Congressional Bills*

The last issue on the merits is Venckiene's argument that her extradition should have been stayed because of legislation that had been introduced in the 115th Congress. She relies on H.R. 6218 and H.R. 6257, together titled the "Give Judge Venckiene Her Day in Court Act." If enacted, either bill would have excluded Venckiene from the scope of the Lithuania-U.S. extradition treaty and allowed her to remain in the United States until her pending asylum application is decided.

Venckiene cites no legal authority for her suggestion that pending legislation should entitle her to a stay, much less that the district court abused its discretion in not granting her motion to stay on these grounds. The processes of the courts take time, and even with the time the case has been pending in this court, no legislation passed in the now-adjourned 115th Congress. Federal courts apply duly enacted laws; they do not try to guess which bills may or may not be enacted into law. Venckiene is not likely to succeed on the merits of this claim in her habeas petition.

D.  *Remaining Stay Factors*

The remaining *Nken/Hilton* factors on stays pending ap-
peal do not indicate that the district court abused its discre-
tion in denying Venckiene's motion to stay her extradition.
Venckiene argues that she is entitled to a stay because she will
suffer irreparable harm in the absence of a stay, there is no
harm to Lithuania in delaying her extradition, and the public
interest favors affording her a full opportunity to litigate her
extradition claims. We disagree with these assertions.
Venckiene is correct that if we affirm the district court's denial
of her motion to stay, she will be extradited to Lithuania and
her pending claims will be moot. This is the harm facing every
petitioner who lacks meritorious habeas corpus claims chal-
lenging an impending extradition. And Venckiene will still
have an opportunity to challenge the charges against her.
That opportunity must come in the Lithuanian justice system,
not ours. The harm Venckiene will suffer from the denial of
the stay is certainly lessened by the fact that she will still have
her day in court. See *Artukovic v. Rison*, 784 F.2d 1354, 1356
(9th Cir. 1986) (reviewing a petitioner's emergency order to
stay his extradition and finding that the hardship petitioner
will suffer from denial of the motion—extradition to Yugosla-
via and mootness of his claims—"is tempered by [peti-
tioner's] ability to defend himself at trial in Yugoslavia").

Venckiene argues that her ability to be heard in a Lithua-
nian court does little to diminish the harm she will suffer
without a stay. She provided the court with letters from peo-
ple in Lithuania who believe her physical safety would be at
risk if she is returned to Lithuania. However, as explained
above, these important humanitarian considerations are left
to the executive branch. Further, in this case, we have already

considered the likely merits of Venckiene's claim that extradition is improper on the ground that Lithuania would use atrocious procedures and punishments. This argument is unlikely to be successful on habeas corpus review; it does not counsel in favor of granting a stay. To the extent these letters and Venckiene contend that she will be subject to physical harm from sources outside of the Lithuanian government, these are humanitarian arguments that are in the purview of the Secretary of State in extradition proceedings.

Because the government is the party opposing Venckiene's motion, we consider the third and fourth *Nken/Hilton* factors—harm to the opposing party and the public interest—as one. *Nken v. Holder*, 556 U.S. 418, 435 (2019). For extradition treaties to operate successfully, each party must comply with their terms and be able to trust that the other party will do the same. Failure to comply with foreign nations' proper extradition requests threatens to erode the effective force of these treaties. If other countries lose confidence that the United States will abide by its treaties, the United States risks losing the ability to obtain the extraditions of people who commit crimes here and flee to other countries. It is within the public interest for this country to be able to try those who commit crimes here within our justice system. That requires the United States to maintain good faith with foreign nations.

The district court did not abuse its discretion in denying Venckiene's motion to stay her extradition. The order of the district court is

AFFIRMED.